742 So.2d 1029 (1999)
Roy W. MATHENY and Sara Matheny, Plaintiffs-Appellees.
v.
Dennis Ray LUDWIG and Shelley Renee Ludwig, Defendants-Appellees.
No. 32,288-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*1031 Joseph B. Stamey, Natchitoches, Counsel for Third Party Defendant-Appellant First Financial Ins. Co.
Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, Counsel for Defendants-Appellees.
Travis M. Holley, Bastrop, Counsel for Plaintiffs-Appellees.
Before STEWART, CARAWAY and DREW, JJ.
STEWART, J.
Roy and Sara Matheny (the "Mathenys") filed suit against Dennis and Shelley Ludwig (the "Ludwigs") after waste grease stored by the Ludwigs drained onto their property causing damages and a foul odor. The Ludwigs filed a third party demand against First Financial Insurance Company ("FFIC"), their liability insurer, after FFIC denied coverage and declined to provide a defense to the Mathenys' suit. The trial court rendered a judgment awarding the Mathenys $3,486 in damages. The trial court also determined the damages were within the coverage afforded by FFIC's policy and ordered FFIC to pay the Ludwigs $2,856.43 for attorney fees, costs, and expenses incurred in defending the suit. FFIC now appeals the trial court's finding of coverage and award of expenses to the Ludwigs. The Ludwigs answer the appeal to seek an increase in the amount awarded for their expenses in defending the suit and pursuing the appeal. We reverse the trial court's judgment in part and affirm in part.

FACTS
The Ludwigs own property on the north side of U.S. Highway 80 in Calhoun, Louisiana. The Mathenys own property on the south side of U.S. Highway 80, directly across from the Ludwigs' property. The Ludwigs' property is at a higher elevation than the Mathenys' property. The natural drainage flows from the north side of the highway into a culvert that passes beneath the highway and then along the west side of the Mathenys' property into an old creek bed. The Mathenys, after purchasing their property in February 1997, began improving the property to open a restaurant. Improvements included leveling the property, creating a parking area, and seeding the west side of the property with rye grass.
Dennis Ludwig collects waste grease from various businesses. He stores the waste grease in three tanks located on his property. When enough grease is collected, Ludwig sells it for recycling into animal feed. Near the end of February 1997, Roy Matheny noticed an offensive smell on his property and found grease along the south side of his property. Matheny informed Ludwig of the problem and contacted the Ouachita Parish Health Department which referred the matter to the Department of Environmental Quality ("DEQ").
Doug Wheelington ("Wheelington"), an environmental coordinator for DEQ's Office of Solid and Hazardous WasteSolid Waste Division, investigated the incident on March 7, 1997. Wheelington found accumulations of waste grease residue on the Mathenys' property. The residue was of sufficient quantity to cause odors and possibly damage recently planted vegetation. Ludwig did not deny that the grease came from his property. He claimed that the cover had been left off of one of the tanks located beneath the roof of a building and heavy rainfall had caused the tank to overflow and drain beneath the highway and onto the Mathenys' property. Ludwig also claimed that the Mathenys' improvements to their property had impeded the natural drainage resulting in the waste grease covering a greater portion of the property. Wheelington accepted Ludwig's explanation. However, Wheelington also determined that Ludwig had violated a number of environmental regulations pertaining to the failure to properly dispose of solid waste, the failure to notify of unauthorized *1032 discharges, and the failure to comply with solid waste regulations.[1]
Wheelington suggested ways to remedy the damage to the Mathenys' property. The suggestions included either removing the top two inches of contaminated soil and transporting it to a solid waste disposal facility or incorporating the contaminated area into the soil to allow bacteria to break down the waste grease. Both options also required the addition of new topsoil and reseeding of the contaminated area. Wheelington also contacted DEQ's Air Quality Division to determine whether a brush pile containing grease residue located at the rear of the Mathenys' property could be burned on-site. Ludwig agreed to remedy the situation to the Mathenys' satisfaction and in accordance with DEQ guidelines. Ludwig then contacted his liability insurer, FFIC. FFIC investigated Ludwig's claim and denied coverage pursuant to a "Total Pollution Exclusion Endorsement" contained in Ludwig's policy. Ludwig also contacted a contractor, John D. Huddleston, who agreed to remove the contaminated soil, add new topsoil, and reseed the area for $1,000 plus the cost of the seed. However, Huddleston was unable to do the job because of other obligations.
When Matheny learned that Ludwig's insurer would not cover the claim and nothing further was done by Ludwig to remedy the problem, Matheny contracted with others to clear and bury the contaminated soil, burn the brush pile, spread new dirt, and reseed the area. The Mathenys also filed the instant suit against the Ludwigs in April 1997, seeking damages for the expenses incurred in remedying the contaminated area, the delay in the opening of their restaurant, and the inconvenience caused by the noxious odors from the waste grease. The Ludwigs then filed a third party demand against FFIC challenging the denial of coverage and seeking reimbursement for expenses incurred in defending against the Mathenys' suit.
After a bench trial, the trial court determined that the Mathenys were entitled to damages in the amount of $3,486 to cover the costs of remedying their property. The trial court also determined that the pollution exclusion contained in the Ludwigs' liability policy did not exclude coverage. The basis for the trial court's determination was that DEQ did not categorize the waste grease as either a pollutant or a hazardous material, but rather referred to it as a waste product. The trial court concluded that waste grease is biodegradable and can be simply plowed into the ground without causing environmental damage. Additionally, the trial court noted that the particular situation at issue did not involve the clean up of classic hazardous waste and did not arise from the illegal handling of any products. Because the Ludwigs had to hire an attorney to represent them when FFIC denied coverage and declined to defend the suit, the trial court awarded them $2,856.43 on their third party demand. This appeal followed.

DISCUSSION

Insurance Coverage
The first issue to be addressed is FFIC's contention that the trial court erred in finding that the pollution exclusion endorsement contained in the Ludwigs' liability policy did not exclude coverage and in finding that the waste grease was not pollution which would be excluded from coverage. FFIC asserts that the recent Louisiana Supreme Court decision in Ducote v. Koch Pipeline Co., L.P., 98-0942 (La.1/20/99),730 So.2d 432, interpreting the same pollution exclusion at issue here favors a finding of no coverage. We agree.
In Ducote, supra, a release of anhydrous ammonia occurred when a tractor overturned and its blade struck a pipeline. Ramona Ducote filed suit alleging that she sustained personal injuries as a result of *1033 the ammonia exposure. FFIC, one of the liability insurers involved in the suit, denied coverage in reliance on the total pollution exclusion contained in the applicable policy. The trial court ruled that the pollution exclusion did not exclude coverage and the Third Circuit affirmed that judgment in Ducote v. Koch Pipeline Co., L.P., 97-1257 (La.App. 3rd Cir. 3/6/98), 709 So.2d 288. Relying on jurisprudence interpreting absolute pollution exclusions, the Third Circuit determined that pollution exclusions apply only to "active industrial polluters" which knowingly emit pollutants over extended periods of time and do not apply in situations involving "accidental releases of pollutants by businesses which are not active industrial polluters." Ducote, 709 So.2d at 291.
In reversing the Third Circuit's decision, the Louisiana Supreme Court, after reviewing the legal principles applicable to interpretation of insurance contracts, examined the language of the exclusion at issue and concluded that the policy language contained no support for the lower court's determination that the exclusion applied only to active industrial polluters which knowingly emit pollutants over extended periods of time. Instead, the court found that the plain language of the policy excluded coverage for bodily injury or property damage arising from a polluting discharge "regardless of whether the release was intentional or accidental, a one-time event or part of an on-going pattern of pollution." The court stated:
As a court, we cannot place limitations upon the plain language of a policy exclusion simply because we may think it should have been written that way. Neither can we construe insurance policies based upon a determination as to whether the insured's subjective expectations are reasonable, as such guesswork can only lead to uncertainty and unnecessary litigation.
Ducote v. Koch Pipeline Co., L.P., 98-0942 (La.1/20/99), 730 So.2d 432.
The total pollution exclusion at issue in the instant case and in Ducote provides, in part, that the insurance does not apply to the following:
(1) "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, disposal, seepage, migration, release or escape of pollutants at any time.
(2) Any loss, cost or expense arising out of any:
(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants....
Just as in Ducote, supra, the plain language of the pollution exclusion precludes coverage in this instance. The Mathenys sustained property damage which occurred through the apparently accidental discharge or escape of the waste grease from the Ludwigs' property. Furthermore, the damages awarded to the Mathenys arose from the expense of cleaning up the waste grease from their property. Nothing in the language of the exclusion limits its applicability to situations involving the clean up of hazardous waste spills or to damages arising from the removal or illegal handling of products. The pollution exclusion at issue here was sufficient to preclude coverage for the accidental release of ammonia in Ducote. We find that it is also sufficient to preclude coverage for the accidental release of waste grease in this instance.
In responding to FFIC's argument that the trial court erred in excluding coverage, the Ludwigs assert that the trial court's determination was based on a finding that the waste grease was not a pollutant as contemplated by the exclusion. The Ludwigs point out that waste grease is a nonhazardous substance and therefore not a pollutant. The Ludwigs further contend that the policy does not define words such as contaminant or irritant and that *1034 the meaning of these terms is ambiguous when considering whether they apply to waste grease.
A similar claim was raised in Crabtree v. Hayes-Dockside, Inc., 612 So.2d 249 (La. App. 4 th Cir.1992), review denied, 614 So.2d 1257 (La.1993), wherein it was discussed whether polyvinyl chloride ("PVC") was a pollutant under the terms of a pollution exclusion. The challenger to the exclusion argued that PVC was not a pollutant because it was not hazardous. The court rejected that argument finding that the exclusion was not limited to damages caused by the release of hazardous or toxic substances and that the fact that PVC is not toxic or hazardous does not mean that it is not considered an irritant or a contaminant. The court concluded that PVC dust is an irritant or contaminant that clearly fits within the exclusion.
The total pollution exclusion at issue defines pollutants as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkali, chemicals and waste." The exclusion defines waste to include "material to be recycled, reconditioned or reclaimed." Relevant to our consideration of whether waste grease is a pollutant is this passage cited by the supreme court in Ducote, supra:
The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties....
(Citations omitted).
While Doug Wheelington of the DEQ did not classify the waste grease as a hazardous substance, he did refer to it in terms of being a pollutant, a waste product, a contaminant, and an irritant during the course of his testimony. Additionally, Wheelington noted the odor caused by the waste grease residue, the damage to vegetation, and the possible pollution of waters downstream along the drainage system. Wheelington also explained that simply because waste grease is nonhazardous does not mean that it is not subject to regulation and proper disposal. We also note that the definition of pollution contained in the exclusion includes "waste" as an example of an irritant or a contaminant considered to be a pollutant. It is clear from the record that the waste grease is a waste product that is collected for recycling. As such, waste grease fits squarely within the definition of pollutant included in the exclusion.
Based on our finding that waste grease is a pollutant for purposes of the total pollution exclusion and our appreciation of the recent supreme court decision in Ducote, we reverse that portion of the trial court's judgment finding coverage under the FFIC liability policy. The damages sustained by the Mathenys and payable by the Ludwigs are excluded from coverage pursuant to the total pollution exclusion contained in the Ludwigs' liability policy.

Duty to Defend
FFIC contends that a finding of no coverage requires an additional finding that it is not liable for the litigation expenses incurred by the Ludwigs in defense of the Mathenys' claim. Generally, an insurer's duty to defend suits against its insured is broader than its liability for damage claims. The duty to defend is determined by the allegations of the plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. Steptore v. Masco Const. Co., 93-2064 (La.8/18/94), 643 So.2d 1213; Yount v. Maisano, 627 So.2d 148 (La.1993); Gleason v. State Farm Mutual Auto. Ins. Co., 27,297 (La.App. 2nd Cir. 8/23/95), 660 So.2d 137, review denied, 95-2358 (La.12/15/95), 664 So.2d 454.
Thus, if assuming all the allegations of the plaintiff's petition to be true, *1035 there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the suit regardless of its outcome. Additionally, the allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claim within the scope of the insurer's duty to defend the suit brought against its insured. Yount v. Maisano, supra; C.L. Morris, Inc. v. Southern American Ins. Co., 550 So.2d 828 (La.App. 2nd Cir.1989). The duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy. Steptore v. Masco Const. Co., Inc., supra.
In their petition for damages, the Mathenys alleged that they sustained property damage when grease from the Ludwigs' property was improperly dumped through rain and drainage onto their property. FFIC investigated the claim, determined that its total pollution exclusion applied, and denied coverage. Consequently, FFIC refused to defend the Ludwigs in the suit. The total pollution exclusion was the insurance industry's third attempt to change policy language to further exclude pollution claims, and at the time the Mathenys' claim arose, the new language had not yet been subject to judicial interpretation. See Ducote v. Koch Pipeline Co., L.P., 709 So.2d at 291. Also, the language of the total pollution exclusion was not significantly different from the language of its precursor, the absolute pollution exclusion, which Louisiana courts had interpreted, upon public policy considerations, as not applying to accidental releases of pollutants by businesses which were not active industrial polluters. Id.
The allegations in the Mathenys' petition suggest that the release of grease from the Ludwigs' property was accidental. The allegations do not suggest that the Ludwigs are active industrial polluters. Considering both the judicial treatment of previous pollution exclusions and the allegations in the Mathenys' petition, we find that the petition did not unambiguously exclude coverage for the apparently accidental, one-time release of grease from the Ludwigs' property. As such, FFIC owed a duty to defend the Ludwigs in the suit, at least until a judicial determination of the coverage issue. We affirm the trial court's award of litigation expenses in the amount of $2,856.43 to the Ludwigs.

Damages
The Ludwigs contend that the damages awarded the Mathenys are excessive. The Ludwigs first assert that the work done to remedy the property damage could have been done for only $1,000 plus $15 for the cost of seed and that the expenses claimed by the Mathenys include work unrelated to the polluted area.
In assessing damages in cases of offenses, quasi offenses, and quasi contracts, much discretion is left to the trier of fact. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Morace v. Melvyn's Restaurant, Inc., 30,988 (La.App. 2nd Cir. 9/23/98), 719 So.2d 139. Before an appellate court may disturb an award of damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case. Youn v. Maritime Overseas Corp., supra.
Here, the trial court's award of damages was based upon the evidence of expenses incurred by the Mathenys in remedying the property damage resulting from the waste grease. The Mathenys paid $500 to Arlen Charles Terrell for dozer work. Terrell dug a hole of approximately six or seven feet deep then gathered the topsoil from the area polluted by the waste grease and buried it in the hole. The Mathenys then contracted with John D. Huddleston, who charged $936 for hauling and spreading 234 yards of dirt to fill the area cleared by Terrell. Although the Ludwigs had initially received an estimate of $1,000 from Huddleston who had agreed to remove the topsoil and spread new dirt over the area, Huddleston was unable to *1036 complete the job for the Ludwigs due to prior obligations. Later, the Mathenys contracted with Huddleston to perform a portion of the job. The Mathenys' expenses also included $2,050 charged by Larry Griggs for leveling the dozer work, reseeding the polluted area, and adding sod to prevent the work done from eroding. All of the work done by the Mathenys was in accordance with the DEQ recommendations for removal of the topsoil polluted by the grease and reseeding of the polluted area. We find, as did the trial court, that the Mathenys proved their entitlement to damages in the amount of $3,486.
The Ludwigs also contend that the Mathenys' damages should be reduced by their comparative fault. The comparative fault claim is based upon the Ludwigs' contention that the Mathenys property improvements altered and obstructed the natural drainage thereby causing the release of rainwater and grease over the Mathenys' leveled property, rather than through the natural drain.
The factors courts consider in assessing comparative fault include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm, 469 So.2d 967 (La. 1985); Morace v. Melvyn's Restaurant, Inc., supra.
Even if the property improvements made by the Mathenys resulted in an alteration of the natural drainage system, we cannot say that the Mathenys, in making such improvements, were aware of the danger or created the risk that the lid would be accidentally left off of the Ludwigs' waste grease storage barrel, that rain would cause the barrel to overflow, and that waste grease would flow from the Ludwigs' property across the highway and pollute their own property. The record indicates that the Mathenys' damages resulted from the waste grease polluting their property and not from problems with the natural drainage. We find no merit in the Ludwigs' claim of comparative fault.

CONCLUSION
For the reasons stated, we reverse that portion of the trial court's judgment finding the total pollution exclusion contained in the FFIC policy not applicable to exclude coverage for the Mathenys' damages. We affirm the trial court's award of damages in the amount of $3,486 to the Mathenys, and we affirm the award of litigation expenses in the amount of $2,856.43 to the Ludwigs. Costs of this appeal are assessed equally between FFIC and the Ludwigs.
REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[1] See La. R.S. 33:7.315 and La. R.S. 33:7.901.