RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2001 FED App. 0259P (6th Cir.)
File Name:  01a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SANDRA K. LENNING,
        *Plaintiff-Appellant,*

        *v.*

COMMERCIAL UNION
INSURANCE COMPANY,

        *Defendant-Appellee.*

No. 00-5332

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00154—Jennifer B. Coffman, District Judge.

Argued:  April 25, 2001

Decided and Filed:  August 7, 2001

Before:  BOGGS and CLAY, Circuit Judges; GWIN,
District Judge.

_____

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

————————

**COUNSEL**

**ARGUED:** Charles G. Middleton III, MIDDLETON & REUTLINGER, Louisville, Kentucky, for Appellant. Robert P. Johnson, THOMPSON, HINE & FLORY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Charles G. Middleton III, MIDDLETON & REUTLINGER, Louisville, Kentucky, for Appellant. Robert P. Johnson, THOMPSON, HINE & FLORY, Cincinnati, Ohio, for Appellee.

————————

**OPINION**

————————

CLAY, Circuit Judge. Plaintiff, Sandra Lenning, appeals the district court's order granting summary judgment in favor of Defendant Commercial Union Insurance Company in this diversity action alleging breach of a homeowner's insurance policy and violation of Kentucky consumer protection and insurance statutes. The district court determined that Defendant did not breach the terms of the policy and did not act in bad faith by denying Plaintiff a legal defense against a lawsuit filed against her. The district court further held that Defendant did not violate the Kentucky statutes. We now **AFFIRM**.

**I.**

The following account of the facts is adopted from the district court opinion.

Plaintiff is employed by PNC Bank as a Vice President in its private client group, a position she describes as a lender. Plaintiff's fiancé, Ed Gatterdam, has worked as a general contractor for residential homes. His own construction business ended with his personal bankruptcy in 1990. In 1996, Plaintiff and Gatterdam agreed to build six homes, using the profits from the sale of each home to finance

construction of the next home. According to their plan, Plaintiff would obtain a construction loan to finance the building of each house. Gatterdam would then serve as construction manager and receive a fee paid by Plaintiff. The couple hoped that their plan would generate enough money so that they could retire to Florida. However, Plaintiff now claims that when she purchased the first lot in June of 1996, she intended to build a home for use as her personal residence.

### Sale of the Home

The first house on which Plaintiff and Gatterdam collaborated was built at 5708 Timber Ridge in Prospect, Kentucky.[1] When Gatterdam began clearing the lot and pouring the house's concrete foundation, he erected a sign that read, "E & G Associates--will build to suit."[2] The sign also included Gatterdam's home telephone number, which was assigned to the apartment he shared with Plaintiff. Shortly after Gatterdam poured the foundation, Dennis Tapp, an interior decorator who lived nearby, contacted Plaintiff and Gatterdam by telephone and expressed his interest in purchasing the as yet unbuilt house. Plaintiff believes that Tapp contacted them after seeing the phone number on the sign. Tapp met with Plaintiff and Gatterdam on a Saturday morning to review the house's plans and to suggest design changes. On August 14, 1996, Plaintiff, Gatterdam, and Tapp signed a document titled "Tri-Party Construction Contract," under which Tapp agreed to purchase the home from Plaintiff for $196,000 upon completion.

---

[1]Plaintiff and Gatterdam are now building a fourth home. The second home was constructed on a lot purchased by Plaintiff around the time she purchased the Timber Ridge lot. Plaintiff states that her profit on the three completed homes totals between $121,000 and $128,000. Plaintiff and Gatterdam currently live in an apartment, and they still plan on building a total of six homes.

[2]The sign was apparently used in Gatterdam's construction business prior to his bankruptcy.

Although Tapp was the home buyer, Plaintiff obtained the construction loan necessary to finance the building of the house. She personally paid subcontractors and obtained all necessary building licenses and permits. Plaintiff and Gatterdam jointly sent a letter to one subcontractor expressing their displeasure with the installation of the home's "DRYVIT" outer covering. In addition the two jointly signed all change orders. Although the term "Seller" appeared beneath Plaintiff's signature on the change orders, the forms bore the heading "S. Lenning/E. Gatterdam, Bldr." The parties closed on the contract on January 30, 1997, with Plaintiff conveying the property to Tapp by a general warranty deed at a profit of over $ 30,000. Plaintiff never moved into or spent a night at the house.

### The Homeowner's Insurance Policy

After purchasing the lot, but before entering the contract with Tapp, Plaintiff obtained a custom homeowner's insurance policy (the "policy") written by the Commercial Union Insurance Company ("CUIC") through an independent agent, the Langan Company ("Langan"). The policy purchased by Plaintiff includes a section entitled "SECTION II – LIABILITY COVERAGES", which sets forth the terms for coverage, including a legal defense for personal liability lawsuits:

**COVERAGE E – Personal Liability**

If a claim is made or a suit is brought against an **"insured"** for damages because of **"bodily injury"** or **"property damage"** caused by an **"occurrence"** to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the **"insured"**; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or

fully developed. But the very nature of Tapp's complaint, combined with Plaintiff's own statements during the interview indicating that she was engaged in a business pursuit, made further investigation unnecessary insofar as they demonstrated that there was no potential coverage. In light of these facts, Plaintiff's claim that there remained unresolved questions regarding the nature of Tapp's "negligence" claim and whether Plaintiff was involved in a business pursuit must fail. CUIC had no duty to further investigate or wait to see if the allegations in Tapp's complaint somehow morphed, through amendment or otherwise, from economic claims against Plaintiff as a profit-driven builder into claims falling within the coverage of the policy. For these reasons, we do not believe that Plaintiff can prove that CUIC violated the Unfair Claims Settlement Practices Act. In addition, in light of our finding that CUIC did not breach its duties to defend or act in good faith, Plaintiff cannot demonstrate that the company engaged in any unconscionable business practices that would violate the Consumer Protection Act.

### V.

The facts of this case make clear that there was no possibility of coverage under the policy with respect to the Tapp lawsuit. As a result, CUIC did not have a duty to defend Plaintiff against that suit. In addition, no evidence in the record supports Plaintiff's claim that CUIC violated the Kentucky consumer protection and insurance codes. We therefore hold that the district court correctly determined that no genuine issue of material fact remained and that CUIC was entitled to summary judgment. Accordingly, we **AFFIRM** the district court's judgment.

a written claims manual instructing its agents on claims investigation.

As the district court noted, Kentucky's Unfair Claims Settlement Act does not require insurers to adopt written manuals. In addition, Plaintiff does not point to any procedures that should be contained in such a manual; nor does she demonstrate how CUIC's investigation was substantively inadequate in the case at bar. Lasch testified that in investigating claims,

> [t]here are no specifics. We have, when you first start this business, somebody might hand you a typed list of questions you can ask in an injury case, that sort of thing, but basically you are asking questions that you felt are germane to the issue and there's no set guidelines other than name, address, tell them you're recording, try to mention the date and time . . . I just ask whatever question comes to mind.

(J.A. at 277.) Although she had no written manual to guide her investigation of Plaintiff's claim, Lasch did have the benefit of 20 years worth of experience in the field. In terms of procedure, it is clear that CUIC responded promptly when notified of the claim, received and reviewed the Tapp complaint, interviewed Plaintiff, and referred the matter to in-house counsel for a recommendation as to whether a defense would be provided. Plaintiff does note that CUIC's initial response to her was to suggest that she retain her own counsel until a determination was made regarding whether a defense would be provided. But this response is not the same as a denial of a defense prior to consideration. Furthermore, Plaintiff does not articulate what, if any, standards CUIC should have adopted beyond those that it already implemented. She complains that subsequent to reviewing the initial documents and conducting the telephone interview CUIC conducted no further investigation. In this way she contends that CUIC was prepared to deny her defense protection even though it did not know for certain that no coverage was possible. Plaintiff argues that the facts were not

fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **"occurrence"** equals our limit of liability.

(Policy p. 10, J.A. at 215.)[3]   According to the "DEFINITIONS" section of the policy,

5. **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. **"Bodily injury"**; or

   b. **"Property damage"**.

(Policy p. 1, J.A. at 206.) Another section of the policy, "SECTION II - EXCLUSIONS", excludes certain types of claims from personal liability coverage:

1. **Coverage E – Personal Liability** and **Coverage F – Medical Payments to Others** do not apply to **"bodily injury"** or **"property damage"**:

   a. Which is expected or intended by the **"insured"**;

   b. Arising out of or in connection with a **"business"** engaged in by an **"insured"**. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the **"business"**;

---

[3]The language in bold in this and all other citations to the insurance policy is included in the original document.

. . .

    d.   Arising out of the rendering of or failure to render professional services;

    e.   Arising out of a premises:
        (1) owned by an "insured"

. . .

2.   Coverage E – Personal Liability, does not apply to:

. . .

    b.   **"Property damage"** to property owned by the **"insured"** . . . .

(Policy p. 11, J.A. at 216.)[4]

The policy names only Plaintiff as an insured party. Langan agent Tom Barrett testified at his deposition that at the time Plaintiff purchased the policy, he believed she intended to use the Timber Ridge home as her personal residence. Yet, neither Plaintiff nor Gatterdam informed Barrett or any other Langan agent that they had entered into a tri-party contract with Tapp or that the house had been sold prior to its completion. Because the homeowner's policy included a builder's risk endorsement which would expire upon the completion of construction, Langan agents periodically contacted Plaintiff or Gatterdam to ascertain the building's progress. Langan's activity log for Plaintiff's account indicates that on January 15, 1997, five months after the tri-party contract was executed and two weeks prior to closing, Plaintiff informed a Langan agent that she would close on the home within a few weeks and would advise the company when she moved into the house.

---

[4]The policy defines "business" as a "trade, profession or occupation." (Policy p. 1, J.A. at 206.)

claim and litigate it if the claim is debatable on the law or the facts.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1989) (quoting *Federal Kemper Ins. Co. v. Hornback*, 711 S.W.2d 844, 846-47 (Ky. 1986) (Leibson, J., dissenting) (stating views incorporated by reference in *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 178 (Ky. 1989))). As our previous discussion reflects, it is clear that CUIC was not obligated to defend Plaintiff against the Tapp lawsuit. Therefore, we need not address the remainder of Plaintiff's bad faith claim.

### IV.

Finally, Plaintiff contends that Defendant CUIC violated two Kentucky statutes by failing to reasonably and sufficiently investigate her claim. The Unfair Claims Settlement Practice Act, K.R.S. § 304.12-230, holds insurers liable for, *inter alia*, "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; [and f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies . . . ." K.R.S. § 304.12-230(2)-(3). The Consumer Protection Act, K.R.S. § 367.170(1), prohibits companies, including insurers, from engaging in "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." K.R.S. § 367.170(1), The statute defines "unfair" as "unconscionable". *Id.*

There is no dispute as to whether CUIC's action was timely. CUIC's senior claims adjuster Lasch attempted to contact Plaintiff only one day after receiving notice of the Tapp complaint from Plaintiff's agent at Langan. The very next day, Lasch interviewed Plaintiff. But Plaintiff faults the court for placing too much emphasis on the timeliness of CUIC's response instead of the sufficiency of the response. To this end, she argues that CUIC's investigation was unreasonable because it ended with Lasch's telephone interview of Plaintiff and also because CUIC has not adopted

her. Based upon these facts, we believe that Plaintiff was engaged in a continuous and profit-motivated business activity. Thus, it was apparent from the outset of the litigation that Tapp's complaint concerned a business venture that was excluded from coverage under the policy.

### 3.   Property Owner Exclusion

Coverage was also precluded by the policy's exclusion for damage to property that is owned by the "insured." In an effort to circumvent this exclusion, Plaintiff argues that Tapp took possession of the property on January 30, 1997, and that she did not cancel the insurance policy until immediately after the closing. She therefore contends that the damages alleged by Tapp arose during the policy period, yet not while the property was owned by Plaintiff, but rather when it was owned by Tapp. However, any alleged poor craftsmanship or negligence actually arose while the house was still under construction. Inasmuch as Plaintiff owned the property during the entire construction period and up until the closing, she was the owner at the time the alleged damage occurred. In addition, any occurrence that arose after Tapp took possession could not be covered by the policy, even if Plaintiff had yet to cancel it, because the policy was void upon the completion of the transaction; at that point, Plaintiff was no longer the owner of the insured property.

### B.   Bad Faith

Plaintiff also contends CUIC has violated its duty of good faith. In order to prove a claim of bad faith for refusal to pay a claim, or consequently to defend a claim, an insured party must demonstrate the existence of the following factors:

(1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed. . . . [A]n insurer is . . . entitled to challenge a

### The Tapp Lawsuit

On February 9, 1998, Tapp sued Plaintiff and Gatterdam in Jefferson County, Kentucky, Circuit Court. Plaintiff submitted a copy of Tapp's complaint and the tri-party contract to Langan for forwarding to CUIC. Although he forwarded the documents to CUIC, Langan agent Tom Barrett advised Plaintiff that the policy did not appear to cover her claim. On February 25, 1998, a CUIC supervisor, Ken Schwartz, sent a handwritten note to senior claims representative Karen Lasch. The note informed Lasch of the Tapp lawsuit and alerted her to a "possible exclusion for business operation unless this is an occasional operation/occupation." Lasch attempted to telephone Plaintiff that day, but reached only Gatterdam. The following morning, Lasch again telephoned Plaintiff and obtained her permission to record their conversation. During the conversation, Plaintiff volunteered the fact that she and Gatterdam had originally intended to build a house and then sell it.[5]

---

[5] The recorded conversation between Plaintiff and Lasch included the following exchange:

Q:   . . . And Sandra, what . . . you work for PNC?

A:   Correct.

Q.   And what do you do there?

A.   I'm vice-president in the private bank.

Q.   Okay. And then do you also have a side business or . . . It's got you . . . you as a seller. Did you own some property out in this Timber Ridge development?

A.   Yes, I had bought a lot . . .

Q.   Okay.

A.   . . . and then Ed Gatterdam . . . just happens to be my fianc[é] and a builder . . .

On March 2, 1998, CUIC informed Plaintiff that it reserved all rights and defenses under the policy, including its right to pursue a judicial determination that no coverage existed under the policy. On March 26, 1998, Plaintiff's attorney mailed to Lasch several documents relating to Tapp's lawsuit.[6] Plaintiff's attorney requested that CUIC inform him whether it intended to defend Plaintiff in the Tapp litigation. On April 17, 1998, Lasch sent a letter to Plaintiff explaining that

---

Q.  Okay.

A.  . . . so I said to him I will be the financial person on this if you will build the home.

Q.  Okay.  So the lot was built . . . I mean was the lot purchased by you primarily . . .

A.  Yes.  Yes.

Q.  . . . as a . . . as an investment?

A.  Exactly.

Q.  Okay.  Now, how did you . . . how did . . . how did Dennis [Tapp] come into the picture?  How did he find out about it?

A.  He was living in an apartment complex in the same area . . . .  He had to drive by every day our lot [sic] and we had started . . . we had cleared the lot and had the found . . . not the foundation but the slab poured.  We had been working there maybe two, three weeks.  The idea was for us to build a house and then try to sell it . . . .

(J.A. at 167-68.)  Plaintiff later acknowledged that the transcript of her recorded statement to Lasch represented "probably exactly what I said." (Deposition of Sandra Lenning, J.A. at 538.)  Neither party contests the admissibility of this transcript; in fact, they both rely upon it to support their arguments on appeal.

[6]These documents included the following: Gatterdam's answer and counterclaim, Plaintiff's amended counterclaim, notice of Tapp's deposition, Plaintiff's request for production of documents, Gatterdam's first set of interrogatories, and Gatterdam's first request for production of documents.

actively participated in the home-building plan by acquiring the property upon which the home was built, obtaining financing for the construction through her job as a lender for PNC bank, entering into the tri-party contract, signing change order forms, and even co-writing a letter of complaint to a subcontractor regarding one of its products.  The facts of this case also satisfy the second *Eyler* prong because Plaintiff intended to profit over a period of time from this activity.  Plaintiff stated that the purpose of the home-building plan was to eventually acquire enough money so that she and Gatterdam could move to Florida, and the record reflects that she enjoyed a substantial profit from the sale of the first home.

Plaintiff claims that CUIC conducted an inadequate investigation prior to determining that Tapp's claim arose out of a business pursuit.  She attempts to downplay her role by claiming that it was mainly her fiancé, Gatterdam, who spoke with Tapp regarding the specific plans.  She argues that obtaining funding and signing the change orders were activities she engaged in as a seller merely to protect her investment and to allow her to convey clear title to Tapp.  Plaintiff also contends that she did not initially purchase the property in order to sell it, but rather for use as her personal residence; she notes that she never put the house on the market and that Tapp contacted her without being solicited to purchase the home.  Finally, Plaintiff argues that at the time she was sued, she and Gatterdam no longer planned to build other homes due to the difficulties they had encountered in building the house for Tapp.  In this respect, she claims that no business pursuit existed when she purchased the lot and none existed when Tapp filed his lawsuit.  Plaintiff thus attempts to characterize her involvement as an "occasional business pursuit."  However, we find these arguments unpersuasive.  In her interview with Lasch of CUIC, Plaintiff indicated that she and Gatterdam intended to a build home and then try to sell it.  Although the home-building scheme may have only been in its infancy when Plaintiff secured the policy, it was well underway at the time she delivered possession to Tapp and also subsequently when Tapp sued

engagement or a stated occupation; and as to the latter, there must be shown to be such activity as a means of livelihood, a gainful employment, means of earning a living procuring subsistence or profit, commercial transactions or engagements.

*Id.* at 859 (*quoting Krings v. Safeco Ins. Co.*, 628 P.2d 1071, 1074 (Kan. Ct. App. 1981)). Finding no business pursuit, the *Eyler* court noted that the insured's participation was limited to investing money and protecting his investment. Plaintiff argues that her involvement in the home-building scheme was analogous to the limited involvement of the insured party in *Eyler*. But we believe *Eyler* supports the applicability of the business pursuit exclusion in the instant case.

First, there is a sufficient degree of continuity. Plaintiff and Gatterdam held themselves out as builders and Plaintiff contracted with Tapp to build a home to meet his specifications. The logo on the change order forms read "S. Lenning/E. Gatterdam, Bldr." In addition, Tapp's lawsuit sues both of them in their capacity as builders. These facts alone were sufficient to immediately alert CUIC that Tapp's claim is one "arising out of or in connection with" a business engaged in by Plaintiff. The facts of the instant case are distinguishable from *Eyler*. In that case, the court found that the insured party had not actively participated in the transaction because he did not acquire the merchandise or negotiate its sale.[10]  However, in the case at bar, Plaintiff

---

[10]The district court summarized the facts of *Eyler* as follows:

The insured assisted a farmer in selling used tires to the Chinese government. The insured borrowed $75,000 and became a partner in the anticipated sale. Because the insured's assets were insufficient collateral for the loan, the farm[er] conveyed the tire-storage property to the insured, who then obtained the loan by encumbering the property and his personal dwelling.

(J.A. at 273.) Under these circumstances, the *Eyler* court found that the insured was merely an investor in the tire venture. *Eyler*, 824 S.W.2d at 859.

CUIC would deny a defense for the Tapp lawsuit for two reasons. First, CUIC characterized Tapp's claims as based upon breach of contract, breach of express and implied warranties, and slander of title. CUIC determined that none of these claims qualified as an "occurrence," as defined in the policy, but rather they were business risks assumed by Plaintiff. Second, CUIC explained that even if Tapp's complaint stated a negligence claim for property damage, the policy excluded coverage due to the business risk exclusion.[7]

## Lawsuit Against CUIC

On February 18, 1999, ten months after CUIC issued its letter denying a defense, Plaintiff filed a "Petition for Declaration of Rights" in the Jefferson County, Kentucky, Circuit Court. Plaintiff alleged therein that CUIC's denial of a legal defense breached the terms of her homeowner's insurance policy and constituted bad faith, as well as a violation of Kentucky consumer protection and insurance statutes. After removal to federal court on the basis of diversity jurisdiction, both parties filed motions for summary judgment. On February 17, 2000, the district court issued a Memorandum Opinion and Order granting Defendant CUIC's motion for summary judgment and dismissing the action with prejudice. The district court determined that CUIC had no duty to defend Plaintiff against the Tapp lawsuit because the Tapp complaint did not allege an "occurrence" within the meaning of the policy; Plaintiff was engaged in a business pursuit not covered by the policy by virtue of the business exclusion clause; any liability for damage to the property while Plaintiff owned it is not covered by the express terms of the policy; and any damage to the property after it was sold to Tapp was not covered because such a claim would have arisen after the policy period ended. The district court also granted summary judgment to CUIC with respect to Plaintiff's

---

[7]Lasch's letter indicated that CUIC reserved its right to rely upon other facts and grounds for denial which might subsequently be discovered.

Kentucky statutory claims. Plaintiff filed a timely notice of appeal.

## II.

This Court reviews a grant of summary judgment *de novo* using the same legal standard applied by the district court; however, we review the denial of a summary judgment motion only for abuse of discretion. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989). Not all facts are considered material; a fact is only material if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## III.

### A.   Duty to Defend

Under Kentucky law, in order to recover in any action based on breach of a contract, a plaintiff must show the existence and the breach of a contractually imposed duty. *Strong v. Louisville & Nashville R. Co.*, 43 S.W.2d 11, 13 (Ky. 1931). The terms of Plaintiff's policy provided that CUIC had a duty to defend her against lawsuits that could be covered by the policy. Plaintiff contends that CUIC breached its duty to defend insofar as the allegations in the Tapp complaint were sufficient to require a judicial determination prior to denying coverage. We disagree.

party. *Id.* at 278. However, although the *Brown Foundation* court did hold that "the term 'occurrence' is to be broadly and liberally construed in favor of extending coverage to the insured," *id.* (citation omitted), it is clear that in deciding that case the Kentucky Supreme Court had in mind the broad nature of relief bestowed upon parties insured under CGL policies:

> We must now consider the definition of "occurrence" and its relation to policy exclusions. Under the definition of "occurrence" only damages expected or intended from the standpoint of the insured are excluded. The interpretation placed on this language by the circuit court and the Court of Appeals is clearly at variance with the plain language of the policy. *The primary purpose of a comprehensive general liability policy is to provide broad comprehensive insurance. Obviously the very name of the policy suggests the expectation of maximum coverage.* Consequently the comprehensive policy has been one of the most preferred by businesses and governmental entities over the years because that policy has provided the broadest coverage available. All risks not expressly excluded are covered, including those not contemplated by either party.

*Id.* (emphasis added). In the instant case, Plaintiff did not purchase a broad CGL policy, but a homeowner's insurance policy. She is not therefore entitled to such broad protections.

### 2.   Business Pursuit Exclusion

The district court also held that CUIC's duty to defend was abrogated by the fact that Tapp's claim arose as a result of Plaintiff's business pursuits. In *Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855 (Ky. 1992), the Kentucky Supreme Court adopted a two-part test for determining whether activities may be considered business pursuits:

> To constitute a business pursuit, there must be two elements: first, continuity, and secondly, the profit motive; as to the first, there must be a customary

("CGL") policies, which are often used to insure large-scale business ventures. *See, e.g., Pursell Const., Inc. v. Hawkeye-Sec. Ins. Co.*, 596 N.W.2d 67, 71 (Iowa 1999) ("[D]efective workmanship standing alone, that is, resulting in damages only to the work product itself, is not an occurrence under a CGL policy."); *Heile v. Herrmann*, 736 N.E.2d 566, 568 (Ohio Ct. App. 1999) ("[C]ourts in Ohio, as well as the majority of courts in jurisdictions throughout the country, have concluded that defective workmanship does not constitute an 'occurrence' in policies such as the one here. The courts generally conclude that defective workmanship is not what is meant by the term 'accident' under the definition of 'occurrence.'"); *McAllister v. Peerless Ins. Co.*, 124 N.H. 676 (N.H. 1984) ("The fortuity implied by reference to accident or exposure is not what is commonly meant by failure of workmanship.").

Plaintiff argues that her policy covers faulty craftsmanship claims caused by a contractor because an insured would not normally expect such a poor performance to occur.[9]  In support of this claim, she cites *Brown Foundation*, in which the Kentucky Supreme Court held that only those damages that are expected or intended from the standpoint of the insured are excluded from the definition of the term "occurrence." 814 S.W.2d at 278.  In the case *sub judice*, the district court distinguished *Brown Foundation*, noting that in that case the court defined "occurrence" in the context of a CGL policy instead of a homeowners' policy.  Plaintiff contends that by distinguishing Kentucky law on this ground, the district court made a distinction without a difference.  She argues that the district court erred by not following what she considers clear Kentucky precedent that liberally construes the term "occurrence" as being more expansive than "accident" and including all risks not contemplated by either

---

[9] One of the coverage exclusions provides that any occurrence that is expected or intended by the insured is not covered.  However, this does not mean that any occurrence that is not expected is automatically covered.  Furthermore, an incident must first be considered an "occurrence" before we even reach the scope of this exclusion.

---

Kentucky courts have recognized that the duty to defend is broader than the duty to indemnify.  *See James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991).  Insurers have an obligation to defend if there is an allegation "which potentially, possibly or might come within the coverage of the policy."  *Brown Found.*, 814 S.W.2d at 279 (citing *O'Bannon v. Aetna Cas. and Sur. Co.*, 678 S.W.2d 390 (Ky. 1984)); *cf. Matheny v. Ludwig*, 742 So. 2d 1029 (La. Ct. App. 1999) (holding that the insurer is obligated to defend unless the complaint unambiguously excludes coverage).  Therefore, even if an insurance company denies coverage based on the mistaken belief that it is justified in doing so, the company may still breach its contract with the insured. *See Eskridge v. Educator & Executive Insurers, Inc.*, 677 S.W.2d 887, 889 (Ky. 1984).  However, in the instant case, there was no potential for coverage under the policy.  "The determination of whether a defense is required must be made at the outset of the litigation" by reference to the complaint and known facts.  *Brown Found.*, 814 S.W.2d at 279 (citing *Knapp v. Chevron USA, Inc.*, 781 F.2d 1123 (5th Cir. 1986)).  Tapp's complaint did not allege the type of claims that would be covered by the policy.  In addition, the language of the complaint reveals that any potential coverage was abrogated by two explicit coverage exclusions.

## 1.   The "Occurrence" Requirement

Tapp's complaint alleged that the Timber Ridge home was built with poor workmanship and that he was forced to finish construction at his own expense.[8]  Specifically, Tapp alleged that:

The Defendants breached the Contract by negligently constructing a house for the Plaintiff which was not in

---

[8] Prior to filing the lawsuit, Tapp posted outside his interior design store and new home large signs stating, "Ed Gatterdam and Sandy Lenning Builders?  They never finish a job."

conformity with the Contract and applicable plans, specifications and standards.

(Tapp Complaint, J.A. at 164.)  Tapp also claimed that Plaintiff and Gatterdam improperly filed a mechanic's lien against the property and fraudulently misrepresented their construction practices.  Plaintiff disputes CUIC's conclusion that the complaint alleged a negligent breach of contract. Instead, she characterizes the complaint as alleging negligence apart from breach of contract.  Plaintiff contends that CUIC drew an unwarranted conclusion that the allegations in the complaint unambiguously excluded coverage; she argues that the complaint revealed a possibility of liability under the policy.  In support of this contention, Plaintiff claims that CUIC admitted through its senior claims adjuster Lasch that the Tapp complaint was "vague" and "poorly worded" and that it is possible that the Tapp suit could have come within the terms of the policy.  Therefore, she contends, CUIC should have conducted a more thorough investigation to determine if such coverage was possible. However, even a liberal construction of the complaint would not support Plaintiff's arguments.

First, insofar as the complaint asserted liability for negligence, it cannot be said to allege an "occurrence" under the policy.  Plaintiff's policy covers "bodily injury" and "property damage", the latter of which is defined as "physical injury to, destruction of, or loss of use of tangible property." Plaintiff contends that this definition encompasses physical damage to the home as well as associated loss of the damaged portions of the home that may be included in Tapp's lawsuit. Yet, Tapp has not alleged any damage to, destruction of, or loss of the use of property.  Furthermore, Tapp has not alleged any bodily injury.  Instead, he merely claims that he was forced, at tremendous expense, to complete the construction job that Plaintiff and Gatterdam had left unfinished.  Courts in other states have held that such a purely economic claim cannot constitute an "occurrence."  *See, e.g., Yegge v. Integrity Mut. Ins. Co.*, 534 N.W.2d 100, 102 (Iowa 1995) (homeowners' intangible economic losses from insured

builder's performance in constructing residence not considered "property damage"); *see also Allstate Ins. Co. v. Morgan*, 806 F. Supp. 1460, 1463-65 (N.D. Cal. 1992) (a claim for negligent misrepresentations and omissions does not constitute property damage and therefore implicates no "occurrence"); *Allstate Ins. Co. v. Hansten*, 765 F. Supp. 614, 617 (N.D. Cal. 1991) (holding that no coverage existed for allegations resulting from largely intentional conduct stemming from a residential sales contract).

Second, to the extent that the complaint alleges a breach of contract, there is similarly no "occurrence"; courts have held that a breach of contract claim cannot constitute an "occurrence" under liability policies triggered by an accident or an occurrence.  *See, e.g., Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992) (finding no accident where insured shipbuilder provided tug boat with defective steering mechanism contrary to contract specifications); *Pace Constr. Co. v. United States Fid. & Guar. Ins. Co.*, 934 F.2d 177, 180 (8th Cir. 1991) (no accident where insured subcontractor breached contractual duty to procure insurance for contractor); *see also Magic Valley Potato Shippers v. Cont'l Ins.*, 739 P.2d 372, 375-76 (Idaho 1987).  *But see Auto-Owners Ins. Co. v. Toole*, 947 F. Supp. 1557, 1564 (M.D. Ala. 1996) (declining to adopt a broad holding that contract claims are not occurrences and instead looking to the "specific 'kind of . . . claim' being asserted, regardless as to whether it is labeled a contract claim, a tort claim, or whatever, and the 'purpose of the general liability policy' from which coverage is sought") (quoting *City of Burlington v. Nat'l Union Fire Ins. Co.*, 655 A.2d 719, 722 (Vt. 1994)).

In addition, there is no "occurrence" to the extent that Tapp's complaint alleges property damage arising out of defective or faulty craftsmanship.  The majority of courts to consider the issue have concluded that policies do not provide coverage where the damages claimed are the cost of correcting the work itself, even in the context of the broad protections offered by a comprehensive general liability