# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **IN RE: CVS OPIOID** | ) | Consol. C.A. No. N22C-02-045 |
| **INSURANCE LITIGATION** | ) | PRW CCLD |

Submitted: July 24, 2023
Decided: August 25, 2023

## OPINION AND ORDER

*Upon Insurers' and Joining Insurers' Motions for Partial Summary Judgment*
**GRANTED**

Garrett B. Moritz, Esquire, and R. Garret Rice, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Michael S. Shuster, Esquire, Daniel M. Sullivan, Esquire, Blair E. Kaminsky, Esquire, and Daniel M. Horowitz, Esquire, HOLWELL SHUSTER & GOLDBERG LLP, New York, New York, *Attorneys for ACE Property and Casualty Insurance Company, Federal Insurance Company, Indemnity Insurance Company of North America, Vigilant Insurance Company, and Westchester Fire Insurance Company*.

Robert J. Katzenstein, Esquire, and Julie M. O'Dell, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington Delaware; Christopher J. St. Jeanos, Esquire, WILLKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for American Home Assurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, P.A., and New Hampshire Insurance Company*.

Bruce W. McCullough, Esquire, BODELL BOVÉ, LLC, Wilmington, Delaware; Karen M. Dixon, Esquire, SKARZYNSKI MARICK & BLACK LLP, Chicago, Illinois, *Attorneys for American Zurich Insurance Company, Zurich American Insurance Company, and American Guarantee & Liability Insurance Company*.

Joseph B. Cicero, Esquire, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Adam H. Fleischer, Esquire, R. Patrick Bedell, Esquire, and Allyson C. Spacht, Esquire, BATESCAREY LLP, Chicago, Illinois, *Attorneys for Great American Alliance Insurance Company, Great American Insurance Company of New York, Great American Insurance Company, and Tamarack American, Inc*.

Louis J. Rizzo, Jr., Esquire, REGER RIZZO & DARNALL LLP, Wilmington, Delaware; Monica T. Sullivan, Esquire, Matthew J. Fink, Esquire, Leena Soni, Esquire, and Stephanie M. Flowers, Esquire, NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP, Chicago, Illinois, *Attorneys for Endurance American Insurance Company, and North American Capacity Insurance Company.*

Sean J. Bellew, Esquire, BELLEW LLC, Wilmington, Delaware; Michael A. Kotula, Esquire, RIVKIN RADLER LLP, *Attorneys for Allianz Insurance Company, Fireman's Fund Insurance Company, Interstate Indemnity Company, and National Surety Company.*

Loren R. Barron, Esquire, WEBER GALLAGHER, Wilmington, Delaware, *Attorney for Gemini Insurance Company, and Berkley National Insurance Company.*

Wade A. Adams, III, Esquire, LAW OFFICES OF WADE A. ADAMS, III, Newark, Delaware; Bryce L. Friedman, Esquire, and Matthew C. Penny, Esquire, SIMPSON THACHER & BARTLETT LLP, New York, New York, *Attorneys for Discover Property and Casualty Company, St. Paul Fire and Marine Insurance Company, Gulf Underwriters Insurance Company, United States Fidelity and Guaranty Company, and The Travelers Indemnity Company.*

Thad J. Bracegirdle, Esquire, Sarah T. Andrade, Esquire, and Emily L. Skaug, Esquire BAYARD, P.A., Wilmington, Delaware; Edward B. Parks, II, Esquire, and Sara Hunkler, Esquire, RUGGERI PARKS WEINBERG LLP, Washington, D.C., *Attorneys for First State Insurance Company, and Twin City Fire Insurance Company.*

Peter B. Ladig, Esquire, Elizabeth A. Powers, Esquire, BAYARD, P.A., Wilmington, Delaware; Kevin T. Coughlin, Esquire, Suzanne C. Midlige, Esquire, and Patrick K. Coughlin, Esquire, Tanya M. Mascarich, Esquire, Zachary M. Sherman, Esquire, COUGHLIN MIDLIGE & GARLAND LLP, Morristown, New Jersey, *Attorneys for Arrowood Indemnity Company.*

Kevin. J. Connors, Esquire, MARSHALL DENNEHEY WARNER COLMAN & GOGGIN P.C., Wilmington, Delaware; Cheryl P. Vollweiler, Esquire, SKARZYNSKI MARICK & BLACK LLP, New York, New York, *Attorneys for AXIS Insurance Company.*

Philip Trainer, Jr., Esquire, and Marie M. Degnan, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Robert A. Kole, Esquire, and Caroline M. Trusty, Esquire,

CHOATE, HALL & STEWART LLP, Boston, Massachusetts, *Attorneys for Liberty Insurance Underwriters, Inc.*, *Liberty International Underwriters, and The Ohio Casualty Insurance Company.*

Marc S. Casarino, Esquire, KENNEDYS CMK LLP, Wilmington, Delaware; Christopher R. Carroll, Esquire, Jillian D. Dennehy, Esquire, and Joshua S. Wirtshafter, Esquire, KENNEDYS CMK LLP, Basking Ridge, New Jersey, *Attorneys for TIG Insurance Company.*

Kathleen M. Miller, Esquire, and Robert K. Beste, Esquire, SMITH KATZENSTEIN & JENKINS LLP, Wilmington Delaware; Keith Moskowitz, Esquire, DENTONS US LLP, Chicago, Illinois; Kathryn Guinn, Esquire, DENTONS US LLP, Denver, Colorado; Deborah J. Campbell, Esquire, DENTONS US LLP, St. Louis, Missouri, *Attorneys for XL Insurance America, Inc., Greenwich Insurance Company, and The Continental Insurance Company.*

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, and Zachary J. Schnapp, Esquire, BERGER HARRIS LLP, Wilmington, Delaware; Kirk Pasich, Esquire, PASICH LLP, Los Angeles, California; Jeffrey L. Schulman, Esquire, and Peter A. Halprin, Esquire, Tae E. Andrews, Esquire, PASICH LLP, New York, New York, *Attorneys for CVS Health Corporation.*

**WALLACE, J.**

## I. INTRODUCTION

The opioid crisis in the United States has produced countless lawsuits brought by governmental entities against suppliers, manufacturers, and distributors of opioids (the "Opioid Lawsuits"). To recoup the costs of defending against and settling these lawsuits, those defendants have sought coverage from various insurance companies. Early last year, the Delaware Supreme Court in *ACE American Insurance Co. v. Rite Aid Corp.* ("*Rite Aid*") issued a key ruling in the insurance landscape for opioid litigation by finding that claims seeking generalized economic damages to redress the opioid crisis are not claims seeking "damages because of bodily injury."[1] This Court applies that decision today to retail pharmacy giant CVS Health Corporation ("CVS").

With respect to Plaintiffs Chubb and AIG (the "Insurers"), at issue are nine Opioid Lawsuits where CVS Health has been named as a defendant. Two of the lawsuits (*Summit* and *Cuyahoga*) are "Track One Suits" that are part of the consolidated multi-district litigation styled *In Re: National Prescription Opioid Litigation*, 17-md-2804 (N.D. Ohio) (the "MDL").[2] Seven of them (*Florida*, *Philadelphia*, *Cherokee*, *Lake*, *Trumbull*, *Suffolk*, and *Nassau*) are the Insurers'

---

[1]  270 A.3d 239 (Del. 2022).

[2]  Chubb and AIG's Motion for Partial Summary Judgment (the "Insurers' Motion") at 6 (D.I. 279).

Additional Representative Suits (the "Additional Representative Suits").[3] This Court has carefully reviewed each underlying complaint in those suits.

Present before the Court is Insurers' motion for partial summary judgment, seeking a declaration that they owe no duty to defend CVS for the Track One Suits and the Additional Representative Suits (the "Insurers' Motion").[4] Additionally, Defendant Insurers named in CVS's Third-Party complaint (the "Joining Insurers") have joined in the Insurers' Motion (the "Joinder Motion").[5] They seek a declaration that they have no duty to defend or indemnify CVS for the Track One Suits and the Additional Representative Suits.[6]

For the reasons explained below, the Insurers' Motion is **GRANTED**, and Joining Insurers' Motion is also **GRANTED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

There are a significant number of parties to this consolidated action. The relevant parties are referred to generally as the Insurers, the Joining Insurers, and

---

[3] Insurers' Motion at 4.

[4] *Id*. at 4-5.

[5] Joining Insurers' Motion for Partial Summary Judgment and Joinder in the Insurers' Motion for Partial Summary Judgment (the "Joinder Motion") at 3-4 (D.I. 286). The Joinder Motion in essence adopts in whole the Insurers' Motion. Therefore, this Memorandum Opinion will typically discuss the Insurers' Motion, which encompasses both the Insurers' and Joining Insurers' arguments.

[6] *Id*. at 3-4.

CVS. The parties from the original complaint include Insurers Chubb[7] and AIG, [8] as well as CVS. CVS is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.[9] CVS also filed a Third-Party Complaint against a number of insurers,[10] included among them are the Joining Insurers. [11]

## B. THE OPIOID LAWSUITS

It is well-known that the United States has grappled with the opioid addiction crisis for many years. The Centers for Disease Control and Prevention has described it as a "national epidemic,"[12] and states, counties, municipalities, and Native American tribes have filed thousands of Opioid Lawsuits against opioid manufacturers, distributors, and retailers.[13] Many of the Opioid Lawsuits are consolidated in the MDL; others are pending in state courts around the country.[14] On November 2, 2022, CVS announced it had reached an agreement in principle to "substantially resolve all opioid lawsuits" brought "by states, political subdivisions,

---

[7]  The Chubb Plaintiffs are ACE Property and Casualty Insurance Company, Federal Insurance Company, Indemnity Insurance Company of North America, Vigilant Insurance Company, and Westchester Fire Insurance Company. *See* Insurers' Motion at 1 n.1.

[8]  The AIG Plaintiffs are National Union Fire and Insurance Company of Pittsburgh, Pa., American Home Insurance Company, and New Hampshire Insurance Company. *See id*. n.2.

[9]  Complaint ("Compl.") ¶ 15 (D.I. 1).

[10]  *See generally* Third-Party Complaint ("CVS Compl.") (D.I. 220).

[11]  The Joining Insurers are listed in the Joinder Motion. *See* Joinder Motion at 1 n.1.

[12]  Insurers' Motion, Ex. 1.

[13]  Insurers' Motion at 6.

[14]  *Id*.

such as counties and cities, and tribes in the United States."[15]

### 1. The Track One Suits

The MDL court designated two Opioid Lawsuits—the Track One Suits—as bellwether cases for purposes of discovery and trial.[16] Those plaintiffs, which include the Ohio Counties of Summit and Cuyahoga, seek to recover from retail pharmacies (among other defendants) losses allegedly incurred in responding to the opioid crisis.[17] Both the *Cuyahoga* and *Summit* complaints make clear that the plaintiffs, in their assertion of common law nuisance claims, "do not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act."[18] The complaints instead allege those plaintiffs suffered "unique harms" that "are of a different kind and degree than Ohio citizens at large…[and that] [t]hese…harms…can only be suffered by [Cuyahoga and Summit counties]."[19] Additionally, the complaints "assert[] their own rights and interests and [their] claims are not based upon or derivative of the

---

[15] *CVS Health reaches agreement in principle for global opioid settlement*, CVS HEALTH (Nov. 2, 2022), www.cvshealth.com/news/community/cvs-health-reaches-agreement-in-principle-for-global-opioid.html)); Insurers' Motion at 7.

[16] Insurers' Motion at 8.

[17] *Id.*; *see also* CVS's Opposition Brief to the Insurers' Motion ("CVS Opp'n to Insurers' Motion") at 11 (D.I. 327).

[18] Insurers' Motion, Ex. 2 ("Summit Compl.") ¶ 1038; Ex. 3 ("Cuyahoga Compl.") ¶ 1080.

[19] *Id.* ¶ 1074; Summit Compl. ¶ 1032.

rights of others."[20]

**a. The *Summit* suit**

The *Summit* complaint contains allegations that "national retail pharmacy chains earned enormous profits by flooding the country with prescription opioids…and instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it."[21] Moreover, according to the *Summit* plaintiffs, defendants "disregarded their reporting and due diligence obligations,"[22] and cite to increased government expenditures for emergency, medical and social services in response to increased rates of opioid addiction, overdose deaths, and other opioid-related fatalities.[23] To illustrate, those plaintiffs allege that:

- 1,053 residents died from drug overdoses between mid-August 2017 and 2022;[24]

- overdoses spiked to 19 a day in July 2016;[25]

- from 2012 to 2017, the County's Children Services Board incurred nearly $24 million in costs;[26] and

---

[20] *Id.* ¶ 1033; Cuhayoga Compl. ¶ 1075.

[21] *Id.* ¶ 608.

[22] *Id.* ¶ 714.

[23] *Id.* ¶¶ 715-746.

[24] *Id.* ¶ 722.

[25] *Id.* ¶ 731.

[26] *Id.* ¶ 735.

- the Alcohol, Drug, Addiction, and Mental Health Services Board incurred more than $10 million in costs.[27]

The *Summit* plaintiffs assert a variety of tort and statutory-based claims, including statutory and common law nuisance and negligence claims.[28]

### b. The *Cuyahoga* suit

The *Cuyahoga* complaint contains substantively identical allegations and claims.[29] It identifies increased levels of overdose deaths, and other opioid-related fatalities as well as increased county expenditures in the form of emergency, medical and social services, addiction-related treatment, and incarceration costs.[30] It further identifies specific providers, and gives data on the number of opioids distributed in the county from 2006 and 2014.[31] In terms of costs to the county, it alleges that Cuyahoga has spent "approximately $1.45 billion" in its annual budget to address the opioid crisis,[32] and provides illustrative examples including:

- treatment in 2016 of 1,440 individuals for opioid-use disorder or dependence;[33]

---

[27]   *Id.*

[28]   *See id.* ¶¶ 975-1072, 1091-1138.

[29]   *See* Cuyahoga Compl.

[30]   *Id.* ¶¶ 700-710, 752-773.

[31]   *Id.* ¶¶ 715-728.

[32]   *Id.* ¶ 729.

[33]   *Id.* ¶ 730.

- increased budget expenditures of $39.4 million by Cuyahoga's Alcohol, Drug Addiction and Mental Health Services;[34]

- increased costs of providing treatment beds from $4.9 million in 2014 to $9.9 million in 2017;[35]

- administration by Cuyahoga County EMS of 1,903 doses of naloxone in 2015, 5,100 doses in 2016, and 6,643 doses in 2017;[36]

- treatment and recovery services for 82 patients "at a cost of $10,190 per patient (a cost of more than $835,000);[37]

- participation of 105 patients in addiction counseling at a rate of $87.28 an hour;"[38]

- an estimated "$185,000 a year for medication assisted treatments for jail inmates;"[39]

- "$100,000 in vivitrol shots" in 2017;[40] and

- a "$3.5 million contract in 2017 for the county's more than 2,300 inmates."[41]

And the *Cuyahoga* complaint sets out liability claims similar to those in the *Summit* complaint.[42]

---

[34]   *Id.* ¶ 731.

[35]   *Id.* ¶ 734.

[36]   *Id.* ¶ 739.

[37]   *Id.* ¶ 750.

[38]   *Id.*

[39]   *Id.* ¶ 765.

[40]   *Id.* ¶ 770.

[41]   *Id.* ¶ 764.

[42]   *See id.* ¶¶ 1017-1115, 1134-1179.

## 2. The Additional Representative Suits

There are seven Additional Representative Suits. Two are brought by counties in Ohio—Lake and Trumbull Counties ("Track Three Suits.").[43] Two are brought by counties in New York—Nassau and Suffolk Counties.[44] And the three other lawsuits are brought by the Cherokee Nation, the City of Philadelphia, and the State of Florida.[45] Like the Track One Suits, each Additional Representative Suit is brought by a governmental entity and seeks to recover from CVS (and other defendants) losses allegedly incurred in responding to the opioid crisis.[46] Some of the Additional Representative Suits have been settled by CVS;[47] others went to trial.[48]

### a. The Track Three Suits

The Track Three Suits largely mirror the allegations in the Track One Suits. Plaintiffs in the Track Three Suits raise common law nuisance claims against distributors and pharmacies, and seek "abatement of the nuisance" they allege defendants created.[49] These suits take:

---

[43] CVS Opp'n to Insurers' Motion at 10.

[44] *Id.*

[45] *Id.* at 8-9.

[46] Insurers' Motion at 9.

[47] *Id.*

[48] *Id.* at 10.

[49] Insurers' Motion, Ex. 4 ("Lake Compl.") ¶ 607; Ex. 12 ("Trumbull Compl.") ¶ 607.

"aim at a primary cause of the opioid crisis: a supply chain scheme, pursuant to which distributors and pharmacies failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, and instead actively contributed to the oversupply of such drugs and fueled an illegal secondary market."[50]

The Track Three plaintiffs allege defendants' conduct has resulted in a variety of costs, including "handling of emergency services to overdoses, providing addiction treatment, handling of opioid related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements."[51] The complaints allege county-specific facts such as the number of opioid deaths, increase in opioid cases, data on the number of opioids prescribed in the county, and identification of "problematic" prescribers.[52] For example, in Lake County, 240 deaths due to heroin or fentanyl overdoses occurred from 2013 to 2017, and opioid cases increased from 296 to 863 during that time period.[53]

### b. The New York suits

The New York suits provide the least-particularized county-specific information in comparison to the Track One and rest of the Track Three Suits, but

---

[50]  *Id.* ¶ 9; Lake Compl. ¶ 9.

[51]  *Id.* ¶ 15; Trumbull Compl. ¶ 15.

[52]  *Id.* ¶ 569; Lake Compl. ¶ 569.

[53]  *Id.* ¶¶ 571, 582.

nonetheless allege the same general pattern of misconduct. The New York plaintiffs allege distributors at the retail level "flooded [the] county with opioids, failed to detect suspicious orders, and failed to prevent diversion of these dangerous products."[54] These plaintiffs say that the retail pharmacies "earned enormous profits by flooding the country with prescription opioids,"[55] and caused "a public health and law-enforcement crisis."[56] And the New York plaintiffs assert a variety of tort and statutory claims, including nuisance and negligence claims.[57]

### c. The *Cherokee* suit

The *Cherokee* complaint is brought by the Cherokee Nation against retail pharmacies and includes allegations that defendants' distribution and dispensing of prescription opioids on and around the Cherokee nation have significantly harmed its citizens.[58] The *Cherokee* plaintiff alleges damages ranging from increased costs of medical care, law enforcement measures, rehabilitation services, welfare and property damage and public blight.[59] Plaintiff states "costs were incurred . . . to address public harm caused by a persistent course of deceptive and unlawful conduct

---

[54] Insurers' Motion, Ex. 14 ("Suffolk Compl.") ¶ 7; Ex. 15 ("Nassau Compl.") ¶7.

[55] *Id*. ¶ 148; Suffolk Compl. ¶ 148.

[56] *Id*. ¶ 150; Nassau Compl. ¶ 150.

[57] Insurers' Motion, Ex. 13 ("New York Short Form Compl.") ¶¶ 784-846; Suffolk Compl. ¶ 234; Nassau Compl. ¶ 234.

[58] Insurers' Motion, Ex. 5 ("Cherokee Compl.") ¶ 13.

[59] *Id*. ¶ 14.

by defendants."[60]  And the *Cherokee* plaintiff alleges that:

- CVS shipped 8,456,500 dosage units of prescription opioids from 2006 to 2014;[61]

- between 2012 and 2014, 484 deaths occurred from unintentional overdoses in Cherokee Nation;[62] and

- there were 5,700 opioid related visits to Cherokee Nation's Behavior Health Department "in recent years."[63]

This plaintiff brings claims of nuisance, negligence/gross negligence, unjust enrichment and conspiracy.[64]  The damages sought are for "harm to Cherokee Nation as a tribal sovereign, including recovery of the funds Cherokee Nation had to spend on opioid-related care."[65]  But, as explained in the *Cherokee* complaint, the claims asserted do not "belong to individual Cherokee citizens," nor does the *Cherokee* plaintiff seek "to recover on behalf of individual citizens based on those individuals' personal injuries or wrongful deaths."[66]

### d. The *Philadelphia* suit

In the *Philadelphia* complaint, the City of Philadelphia asserts claims against defendants to "redress the hazard to public health and safety," "abate the nuisance,"

---

[60]  *Id.* ¶ 15.

[61]  *Id.* ¶ 157.

[62]  *Id.* ¶ 34.

[63]  *Id.* ¶ 47.

[64]  *Id.* ¶¶ 320-70.

[65]  *Id.* ¶ 18.

[66]  *Id.*

and "recoup . . . monies that have been spent" as a result of the opioid epidemic and the alleged misconduct of defendants in unlawfully diverting prescription opioids.[67] The City of Philadelphia asserts claims on behalf of itself and argues they are "wholly independent of any claims that individual users of opioids may have against defendants."[68] *Philadelphia* further alleges the following city-specific opioid-related statistics:

- 963 opioid-related overdose deaths in 2019;[69]

- identification of specific CVS pharmacies and purchase rates;[70]

- treatment of approximately 14,000 people for opioid disorder from October 2015 through September 2016;"[71]

- 651 hospitalizations due to opioid poisoning in 2018;[72]

- administration of naloxone over 4,000 times by the Philadelphia Fire Department, 200 times by the Philadelphia Police Department, 5,000 in 2018 and 3,000 in 2019 by Philadelphia emergency medical services (EMS);[73]

- 1,161 cases of Hepatitis C virus, which is an adverse effect common to opioids with treatment costs of approximately $84,000 per patient in 2016;[74]

---

[67] Insurers' Motion, Ex. 16 ("Philadelphia Compl.") ¶ 1.

[68] *Id.* ¶ 24.

[69] *Id.* ¶ 557.

[70] *Id.* ¶¶ 292-300.

[71] *Id.* ¶ 554.

[72] *Id.* ¶ 555.

[73] *Id.* ¶ 561.

[74] *Id.* ¶¶ 572, 601.

- increased homelessness, and arrests related to opioids;[75]

- treatment of 17,500 people in the publicly-funded health system for opioid-use disorder in 2019, which incur costs from the administration of methodone ($150 per month per person), suboxone ($450 per month per person), and Vivitrol ($1,000 per month per person).[76]

The *Philadelphia* complaint contains claims of public nuisance, statutory violations, and unjust enrichment.[77]

### e. The *Florida* Suit

In the *Florida* complaint, the State of Florida asserts statutory and tort-based claims, including public nuisance and gross negligence, against manufacturer and distributor defendants that plaintiff alleges "cooperated to sell and ship ever-increasing quantities of opioids into Florida."[78] The State of Florida seeks "to hold Defendants accountable for having created and exacerbated the opioid crisis,"[79] and having "caus[ed] the devastating public health and financial effects that have followed."[80] The complaint alleges 779 heroin overdose deaths in Florida in 2015,[81]

---

[75] *Id.* ¶¶ 584, 582.

[76] *Id.* ¶¶ 590, 595, 596.

[77] *Id.* ¶¶ 656 -720.

[78] Insurers' Motion, Ex. 17 ("Florida Complaint") ¶ 1.

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.* ¶ 420.

and 21,700 opioid-related emergency department visits in 2014.[82] The complaint additionally avers these "societal and economic injuries incurred by the State of Florida" were foreseeable to the defendants.[83]

## C. THE POLICIES[84]

CVS seeks indemnification and/or defense costs in connection with the Opioid Lawsuits under the policies at issue in this action. CVS says 229 policies are implicated between the Insurers' Motion and the Joinder Motion.[85] This dispute centers on whether the just-described governmental plaintiffs' lawsuits allege harms resulting in damages because of bodily injury or property damage and trigger duty-to-defend and/or indemnification coverage under those policies.

### 1. The Chubb Policies

Chubb issued annual insurance policies to CVS from 1993 to 2005 and 2008 to 2018 (the "Chubb Policies").[86] CVS purchased at least 26 Chubb Policies

---

[82]  *Id.* ¶ 422.

[83]  *Id.* ¶ 428.

[84]  CVS complained that Insurers failed to provide the Court with complete copies of the Policies. CVS Opp'n to Insurers' Motion at 12. The Court requested supplemental submissions during an earlier status conference, and the parties have since provided all relevant pleadings and policies at issue in the Motions. D.I. No. 357; *see also* CVS's Supplemental Memorandum in Further Opposition to the Insurers' Motion for Partial Summary Judgment ("CVS Supp. Mem.") at 1 n.1.

[85]  *See* CVS Opp'n to Insurers' Motion at 4 (stating the Insurers sold "at least 62 primary, umbrella and excess liability insurance policies" to CVS); CVS's Opposition Brief to the Joinder Motion ("CVS Opp'n to Joinder Motion") at 1 (D.I. 326) (stating the Joining Insurers "seek[] summary judgment with respect to an additional 167 policies for which CVS" paid).

[86]  *See* Insurers' Motion at 10; *id.*, Exs. 18-43.

during the relevant period.[87] And the parties have now identified the relevant provisions of the Chubb Policies.

Chubb promised to pay on behalf of CVS "those sums in excess of the 'retained limit' that [CVS] becomes legally obligated to pay as damages because of 'bodily injury' [or] 'property damage.'"[88] Under the Chubb policies "[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'"[89] "Bodily injury" means "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time."[90] It can include "mental anguish or mental injury resulting from bodily injury."[91] "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "[l]oss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the physical injury that caused it."[92]

If the bodily injury or property damage is caused by an "occurrence" during

---

[87]  CVS Opp'n to Insurers' Motion at 5.

[88]  *E.g.*, Insurers' Motion, Ex. 21 § I.A; CVS Opp'n to Insurers' Motion, Ex. 22 § I.A.

[89]  Insurers' Motion, Ex. 21 § I.D; CVS Opp'n to Insurers' Motion, Ex. 22 § I.D.

[90]  Insurers' Motion, Ex. 21 § VII.C; CVS Opp'n to Insurers' Motion, Ex. 22 § VII.C.

[91]  *Id.*; Insurers' Motion, Ex. 21 § VII.C.

[92]  *Id.* § VII.U; CVS Opp'n to Insurers' Motion, Ex. 22 § VII.U.

-18-

the "policy period," the insurance will apply.[93] An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence,' regardless of the frequency or repetition thereof, or the number of claimants."[94]

Certain policies also contain the "Pharmacist . . . Liability Endorsement." ("Pharmacist Liability Endorsement").[95] The Pharmacist Liability Endorsement states in relevant part that Chubb agrees to pay on behalf of CVS "all sums in excess of the Schedule of Insured's Retained Limits that [CVS] shall become legally obligated to pay as damages because of 'bodily injury' arising out of a 'pharmacist liability incident.'"[96] A "pharmacist liability incident" is an "actual or alleged negligent act, error or omissions, . . . in the performance of a 'pharmacist professional service.'" [97] A "pharmacist professional service" includes the "preparation, selling, handling or distribution of drugs."[98] Under this Endorsement, "occurrence" "does not include any 'pharmacist liability incident.'"[99]

---

[93]   *Id*. § I.A.1; Insurers' Motion, Ex. 21 § I.A.1.

[94]   *Id*. § VII.O; CVS Opp'n to Insurers' Motion, Ex. 22 § VII.O.

[95]   *E.g.*, Insurers' Motion, Ex. 21 at End 27; CVS Opp'n to Insurers' Motion, Ex. 22 at End. 24.

[96]   *Id.*; Insurers' Motion, Ex. 21 at End. 27.

[97]   *Id.*; CVS Opp'n to Insurers' Motion, Ex. 22 at End. 24.

[98]   *Id.*; Insurers' Motion, Ex. 21 at End. 27.

[99]   *Id.*; CVS Opp'n to Insurers' Motion, Ex. 22 at End. 24.

## 2. The AIG Policies

The AIG Policies mirror the Chubb Policies in many respects. AIG issued annual policies to CVS from 1995 to 2000 and 2002 to 2017 (the "AIG Policies").[100] CVS purchased 36 policies from AIG.[101] AIG promised to pay:

> "those sums that [CVS] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. [AIG] will have the right and duty to defend [CVS] against any 'suit' seeking those damages. However, [AIG] will have no duty to defend [CVS] against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which insurance doesn't apply."[102]

"Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[103] "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property."[104] "Property damage" is further defined to mean "[l]oss of use of tangible property that is not physically injured."[105]

The AIG Policies apply to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an "occurrence" during the policy

---

[100] *See* Insurers' Motion at 10; *see* Chubb and AIG's Reply Brief ("Insurers' Reply") Exs. 81-115 (D.I. 334).

[101] CVS Opp'n to Insurers' Motion at 6.

[102] *E.g.,* Insurers' Reply, Ex. 107 § I.1(a).

[103] *Id.* § V.3.

[104] *Id.* § V.17(a).

[105] *Id.* § V.17(b).

period.[106]  An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[107]  Further, "[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'"[108]

CVS additionally points to a "Druggists – Broadened Coverage" Endorsement (the "Druggist Endorsement").  The Druggist Endorsement reads that "'[b]odily injury' or 'property damage' arising out of the rendering of or failure to render professional health care services as a pharmacist shall be deemed to be caused by an 'occurrence.'"[109]

Separately, the Insurers point to 24 AIG Policies with a "Self-Insured Retention Endorsement" that says AIG will pay on behalf of CVS "those sums in excess of the 'Retained Limit' that [CVS] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  [AIG] will have the right but not the duty to defend any 'suit' seeking those

---

[106]  *Id.* § I.1(b).

[107]  *Id.* § V.13.

[108]  *Id.* § I.1(e).

[109]  *Id.* at Druggist End.

-21-

damages."[110]

### 3. The Joining Insurers' Policies

The Joining Insurers issued 167 policies to CVS during the relevant period (the "Joining Insurers' Policies" and together with the Chubb Policies and the AIG Policies, the "Policies").[111]  CVS purchased these policies from 37 Joining Insurers, and the Joining Insurers' Policies include primary, umbrella, and excess coverage.[112] The Joining Insurers say their policies include "terms substantially similar to those in the Chubb and AIG Policies."[113]  CVS says "[a]t least some of [the Joining Insurers' Policies] impose a defense obligation and all of them impose a duty to indemnify CVS."[114]

### D. OUR SUPREME COURT'S DECISION IN *ACE INSURANCE V. RITE AID*

Last year, the Delaware Supreme Court reversed this Court's decision interpreting policy language similar to that here.[115]  In *Rite Aid*, the Supreme Court

---

[110] Insurers' Reply, Ex. 95 at Self-Insured Retention End.  The Insurers say this Endorsement applies to the AIG Policies attached as Exhibits 89, 91-92, 95-114 in Insurers' Reply.  *See id.* at 11.

[111] CVS Opp'n to Joinder Motion at 1.

[112] *Id.*

[113] Joinder Motion at 2.

[114] CVS Opp'n to Joinder Motion at 1 (citing Joinder Motion, Exs. B1-B3, C1-C4, D2, F1-F6, H12-H20, N, R1-R5, W7-W20, X1-X2); *see also id.* (citing Notice of Joinder (D.I. 287), Exs. 5-6, 8, 10-13)).

[115] *Ace Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022), *rev'g*, *Rite Aid Corp. v. ACE Am. Ins. Co.*, 2020 WL 5640817 (Del. Super. Ct. Sept. 22, 2020).

held that underlying claims seeking non-derivative economic loss did not allege damages because of bodily injury and therefore were not subject to coverage under the relevant insurance policies.[116]

The action arose after insurers denied coverage to Rite Aid for the thousands of lawsuits seeking damages for costs arising out of Rite Aid's distribution of opioids.[117] Given the multiplicity of lawsuits, the Supreme Court focused on the claims asserted in the Track One Lawsuits to determine whether the claims alleged damages because of bodily injury.[118] The insurance policies provided that the Insurer will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'property damage' to which the insurance applies."[119] "Personal injury" was defined in part as "bodily injury."[120] The policy defined "[d]amages because of 'personal injury' [to] include damages claimed by any person or organization for care, loss of services, or death resulting at any time from the 'personal injury.'"[121]

---

[116] *Rite Aid*, 270 A.3d at 241, 250.

[117] *Id*. at 242.

[118] *Id*. at 242-43.

[119] *Id*. at 243.

[120] *Id*.

[121] *Id*. The 2015 policy was also substantially similar to the terms in the other policies additional insurers had submitted in connection with Rite Aid's motion for partial summary judgment. This Court also considered a 2018 policy, which differed from the 2015 Policy in that it contained an endorsement that excluded opioid and narcotics liability claims from coverage. *Rite Aid Corp.*, 2020 WL 5640817 at *3-4.

Accordingly, coverage for damages because of personal injury was only available to (a) the person injured, (b) a person recovering on behalf of the person injured, or (c) people or organizations that treated the person injured or deceased, who demonstrate the existence of and cause of the injuries.[122] The Supreme Court found that the plaintiffs in the Track One Lawsuits did not fall under category (a) because the governmental entities themselves could not claim damages for bodily injury.[123] They also did not fall under category (b) because the institutional opioid-litigation plaintiffs disclaimed they were asserting claims on behalf of others.[124]

And, with respect to category (c), the Court found that the plaintiffs were not seeking to recover for damages for the care or death of a person resulting from bodily injury, because the claims were "not directed to an individual injury but to a public health crisis."[125] To qualify for coverage then, the organization, "must show that it treated an individual with an injury, how much that treatment cost, and that the injury was caused by the insured."[126] In short, the alleged damages must "depend on proof of bodily injuries," and could not be for general, non-derivative economic loss.[127]

The Supreme Court further explained it was insufficient for claims to merely

---

[122] *Id*. at 247.

[123] *Id*. at 248.

[124] *Id*. at 247.

[125] *Id*. at 253.

[126] *Id.* at 252.

[127] *Id.* at 250, 254.

allege a "causal connection between the counties' economic damages and the injuries to their citizens from the opioid epidemic."[128] "There must be more than some linkage between the personal injury and damages to recover 'because of' personal injury: namely, bodily injury to the plaintiff, and damages sought because of that specific bodily injury."[129] The bodily injuries alleged in a given complaint must do more than "explain and support" any economic loss the counties suffered.[130] The individual physical injury must be "the basis of the claims," "independently proven, and shown to be caused by the insured."[131] Hence, the Supreme Court found that "the Track One [Suits] have no claims for personal injury—just facts that support the economic loss claims."[132]

## E. THIS LITIGATION

Beginning in October 2017, CVS notified the Insurers of thousands of Opioid Lawsuits, including the Track One Suits and Additional Representative Suits in which CVS is named as a defendant.[133] CVS has sought defense and indemnification under the Policies.[134] The Insurers in return sent coverage position letters wherein

---

[128] *Id*. at 241.

[129] *Id*. at 250.

[130] *Id*.

[131] *Id*. at 250-51.

[132] *Id*. at 250.

[133] Insurers' Motion at 11-12.

[134] *Id*.

they reserved their "rights" to deny coverage under the Policies and explained why they believe the Opioid Lawsuits aren't covered by the Policies.[135]

In the wake of *Rite Aid*, indeed, less than a month after that decision, Chubb filed its complaint in this action seeking three declarations: (1) that Chubb has no duty to defend CVS against the Opioid Lawsuits; (2) that Chubb has no duty to indemnify CVS for the Opioid Lawsuits; and, (3) of rights and obligations, if any, of other insurers if Chubb is found to have a duty to defend or indemnify CVS.[136] Within days, AIG filed a similar action against CVS seeking declarations that AIG had no duty to defend or indemnify CVS for the Opioid Lawsuits.[137] The Court then consolidated the Chubb and AIG actions.[138]

Thereafter, the Court denied CVS's motion to dismiss or stay this consolidated action; that motion argued *forum non conveniens*.[139] The Court noted that there was likely no true conflict between Delaware and Rhode Island law, but concluded it did not need to choose between the two states' law on the motion to dismiss.[140]

The next month, CVS filed its third-party complaint, counterclaims, and

---

[135] *Id.*

[136] Compl. ¶¶ 45-53.

[137] *Id.* ¶¶ 38-45 (D.I. 1) (N22C-02-056 PRW CCLD).

[138] D.I. 93.

[139] *In re CVS Opioid Ins. Litig.*, 2022 WL 3330427 (Del. Super. Ct. Aug. 12, 2022) (D.I. 198).

[140] *Id.*, at *9-10.

cross-claims. CVS asserts causes of action for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) statutory bad faith under Rhode Island statutory law, and (4) a declaration that CVS has a right to have its losses covered by the Insurers and Joining Insurers.[141]

Now before the Court is the Insurers' motion seeking partial summary judgment suggesting that under *Rite Aid* they have no duty to defend CVS for the Opioid Lawsuits. The Joining Insurers, too, seek partial summary judgment that they have no duty to defend or indemnify CVS on the same grounds. CVS opposes both motions.

## III. STANDARD OF REVIEW

Superior Court Civil Rule 56 governs a motion for summary judgment.[142] The Court may grant summary judgment only when "the record demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[143] At the summary judgment stage the Court determines whether genuine issues of material fact exist, but the Court does "not decide such issues."[144] To achieve summary judgment, the movant must carry its

---

[141] CVS Compl. ¶¶ 79-96.

[142] *See* Del. Super. Ct. Civ. R. 56.

[143] *Parexel Int'l (IRL) Ltd. v. Xynomic Pharms., Inc.*, 2020 WL 5202083, at *4 (Del. Super. Ct. Sept. 1, 2020) (quoting Del. Super. Ct. Civ. R. 56(c)).

[144] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99 (Del. 1992) (citation omitted); *see also* *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973).

burden to demonstrate its motion is supported by undisputed material facts.[145] If the movant is successful, then the burden shifts to the non-movant to demonstrate a "genuine issue for trial" still exists.[146] The Court views the facts and draws all reasonable inferences in the light most favorable to the non-movant.[147]

## IV. PARTIES' CONTENTIONS

The Insurers rely on the Supreme Court's decision in *Rite Aid* as grounds for partial summary judgment. They insist they have no duty to defend or indemnify CVS for the Track One Suits and Additional Representative Suits because the Policies cover damages incurred "because of bodily injury," whereas the Opioid Lawsuits seek generalized economic damages.[148] And the Insurers say *Rite Aid* controls because CVS has failed to identify any real or relevant conflict between Rhode Island and Delaware law.[149]

CVS makes five primary arguments that coverage is due under the Policies. First, CVS contends Rhode Island law controls, and that under Rhode Island, claims seeking damages because of bodily injury extend to the nine Opioid Lawsuits

---

[145] *Envolve Pharmacy Sols., Inc. v. Rite Aid Headquarters Corp.*, 2023 WL 2547994, at *7 (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[146] Del. Super. Ct. Civ. R. 56(e).

[147] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977) (citations omitted).

[148] Insurers' Motion at 4.

[149] Insurers' Reply at 5-8.

here.[150] Second, the Policies at issue in this action contain the Pharmacist Liability and Druggist Endorsements, which "broadened coverage" and were triggered because the Track One Suits and Additional Representative Suits allege "pharmacist liability incidents" and "wrongful rendering of services as a pharmacist."[151] Third, the "property damage allegations" in these suits independently trigger coverage under the Policies.[152] Fourth, CVS argues coverage is triggered for the nine Opioid Lawsuits because damages "because of bodily injury" include damages "claimed" by any person or organization for the bodily injury or death "sustained" by a person, and here, governmental entities are claiming damages for bodily injury "sustained by a person."[153] Fifth, Track One Suits and Additional Representative Suits assert "derivative claims" and are thus covered.[154]

## V. DISCUSSION

### A. DELAWARE OR RHODE ISLAND LAW?

The first step in a conflict-of-law analysis is "to decide whether a conflict truly exists, comparing 'the competing jurisdictions to determine whether the laws

---

[150] CVS Opp'n to Insurers' Motion at 23-29.

[151] *Id*. at 13-16.

[152] *Id*. at 16-18.

[153] *Id*. at 2, 19-20.

[154] *Id*. at 18-19.

actually conflict on a relevant point.'"[155] "In determining whether there is an actual conflict, Delaware state courts . . . answer a single and simple inquiry: does application of the competing laws yield the same result?"[156] If the answer is "yes," then the Court "should avoid the choice-of-law analysis altogether."[157] Moreover, the competing laws must actually conflict to require a choice-of-law analysis.[158] When one state's laws do not address a particular issue, "it cannot conflict with the laws of another state."[159] "Where one state fails to address a particular issue, the Court should apply the settled law."[160]

*Rite Aid* is the precedential Delaware decision interpreting whether claims seeking damages because of bodily or personal injury extend to generalized economic losses suffered by governmental entities in seeking to abate the opioid crisis. CVS attempts to avoid application of *Rite Aid* here by identifying certain dicta in Rhode Island cases that are in seeming conflict with the *Rite Aid* decision.

---

[155] *In re CVS Opioid Ins. Litig.*, 2022 WL 3330427, at *8 (quoting *Arch Ins. Co. v. Murdock*, 2018 WL 1129110, at *8 (Del. Super. Ct. Mar. 1, 2018), *aff'd sub. nom.*, *RSUI Indem. Co. v. Murdock*, 248 A.3d 887 (Del. 2021)). Sometimes, an initial inquiry for a choice-of-law analysis is "determining if the parties made an effective choice of law through their contract." *See Certain Underwriters at Llyods, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017). The Policies contain no choice-of-law provisions, so that inquiry is fruitless here.

[156] *Arch Ins. Co.*, 2018 WL 1129110, at *8 (alterations in original) (quoting *Laguelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super. Ct. Oct. 1, 2013)).

[157] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. Ch. 2014).

[158] *Arch Ins. Co.*, 2018 WL 1129110, at *8.

[159] *Id.* (citing *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *4 (Del. Super. Ct. Nov. 5, 2010)).

[160] *Id.*

CVS argues *McEvoy v. Amica Mutual Insurance Company* is controlling law in Rhode Island and in conflict with *Rite Aid* on this point of damages.[161] In *McEvoy*, the defendant insurer issued an automobile policy to the plaintiff.[162] The *McEvoy* plaintiff's minor daughter died from injuries sustained in a car accident. The little girl was a passenger in one of the plaintiff's cars covered by the policy, and the plaintiff sought damages for both the wrongful death claim that survived the deceased child and a loss-of-consortium claim.[163] The Court found that the automobile policy's "each person" liability limit applied—and not the higher, "each accident" liability limit—because in the wrongful death claim and loss-of-consortium claim, the bodily injury occurred to only one person (the deceased child), as oppose to two people (the deceased child and parent).[164] The Court explained that the loss-of-consortium claim was derivative of the wrongful death claim because "all damages for such bodily injury" include "derivative and consequential damages payable to persons other than the one who sustains the bodily injury," and the loss of the deceased's society to plaintiff derived from the wrongful death.[165] Thus, the "each person" limit of liability applied.[166]

---

[161] 1991 WL 789913 (R.I. Super. Ct. Nov. 12, 1991).

[162] *McEvoy*, 1991 WL 789913, at *1.

[163] *Id*. at *2-3.

[164] *Id*. at *3.

[165] *Id*.

[166] *Id*.

CVS misreads *McEvoy* as holding that *all* "derivative and consequential damages payable to persons other than the one who sustains the bodily injury" are damages because of bodily injury. The trial court in *McEvoy* wrote "all damages for bodily injury" include derivative and consequential damages, not "all derivative and consequential damages" are damages for bodily injury.[167] More importantly, the claims in *McEvoy* are the very type of derivative claims that "depend on proof of personal injury" that the Supreme Court in *Rite Aid* distinguished from claims by governmental entities seeking generalized economic losses in responding to the opioid crisis.[168] In *McEvoy*, the plaintiff parent brought a claim on behalf of the deceased daughter that was directly related to and predicated upon the individual injury of the daughter. Under *Rite Aid*, coverage for damages because of bodily injury extended to these types of personal injury claims asserted on behalf of other individuals. The governments in *Rite Aid* simply had not brought such particularized claims. CVS fails to demonstrate an actual conflict exists between *Rite Aid* and *McEvoy*.[169]

---

[167] *Id.*

[168] *Rite Aid*, 270 A.3d at 254.

[169] CVS also cites *American Universal Insurance Co. v. Costello* for the proposition that Rhode Island construes insurance policies broadly. 185 A.2d 447 (R.I. 1962). The Rhode Island Supreme Court in *Costello* construed an automobile insurance policy that contained the language "damages for bodily injury" and noted the "coverage afforded by this type of policy was clearly intended to be broad." *Id.* at 192, 196. The inference CVS draws is that the Delaware Supreme Court construes insurance policies narrowly. Not so. Simply because the Rhode Island Supreme Court stated an auto insurance policy should be broadly construed does not mean it conflicts with Delaware law. Nowhere in *Rite Aid* does the Supreme Court make any mention it is construing

For the Court to engage in the choice-of-law analysis, the competing laws must *actually* conflict.[170] CVS has not shown the two states' laws conflict. So, the Court applies Delaware law.[171]

## B. THE POLICIES AND "BODILY INJURY"

Whether the Policies fall within the scope of *Rite Aid* depends on the language of the Policies and a reasonable reading of the complaints in the Track One Suits and the Additional Representative Suits.

"In construing the language of [an insurance policy,] the Court should interpret the language in the same manner as it would be understood by an objective, reasonable third party."[172] The Court first should "seek to determine the parties' intent from the language of the insurance contract itself—the 'mutual intent at the

the policy narrowly. And no doubt, Delaware law on this point seems to be in harmony with our sister. *See, e.g., Monzo v. Nationwide Property and Casualty Ins. Co.,* 249 A.3d 106, 118 (Del. 2021) ("[I]f there is more than one reasonable interpretation of an insurance policy, Delaware courts apply the interpretation that favors coverage."); *Northrop Grumann Innovation Systems, Inc. v. Zurich Am. Ins. Co.,* 2021 WL 347015, at *9 (Del. Super. Ct. Feb. 2, 2021) ("[A] truly ambiguous insurance contract will be construed most strongly against the insurer and in favor of the insured."), *app. refused,* 2021 WL 1043988 (Del. Mar. 18, 2021).

[170] *Arch Ins. Co.*, 2018 WL 1129110, at *8.

[171] CVS argues that Rhode Island prohibits the consideration of extrinsic evidence, citing a Verdict Form and Abatement Order, as well as insurers' subjective intent. CVS Opp'n to Insurers' Motion at 29-31. The Court does not rely on any extrinsic evidence or insurers' subjective intent to reach its decision here.

[172] *Rite Aid*, 270 A.3d at 245 (alteration in original) (quoting *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *7 (Del. Super. Ct. Jan. 31, 2019)); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonably third party.") (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

time of contracting.'"[173] "Absent ambiguity, contract terms should be accorded their plain, ordinary meaning."[174]

The duty to defend is "broad."[175] "An 'insurer has an obligation to defend its insured, even if the action against the insured is groundless, whenever the complaint . . . may potentially come within the coverage of the policy.'"[176] This is true "even when the complaint has only 'one allegation that falls within the scope of the policy's coverage . . . [and] even if an insured is ultimately found to be not liable.'"[177] Furthermore, "when the complaint alleges 'facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover.'"[178]

---

[173] *Rite Aid*, 270 A.3d at 245 (quoting *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 388 (D. Del. 2002)); *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018); *see also Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997) ("The scope of an insurance policy's coverage . . . is prescribed by the language of the policy.") (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992)).

[174] *Rite Aid*, 270 A.3d at 245 (citing *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012)).

[175] *Id.* at 246.

[176] *Id.* (quoting *Heffernan & Co. v. Hartford Ins. Co. of Am.*, 614 A.2d 295, 298 (1992)).

[177] *Id.* (alteration in original) (quoting *Nationwide Mut. Ins. Co. v. Garzone*, 2009 WL 2996468, at 10 (E.D. Pa. Sept. 17, 2009)).

[178] *Id.* (quoting *Erie Ins. Exch. V. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987)).

**1. Insurers Have No Duty to Defend CVS for The Track One Suits Because The Plaintiffs Do Not Seek Damages "Because of Bodily Injury."**

Under *Rite Aid*, the Track One Suits are not subject to coverage.

First, the *Cuyahoga* and *Summit* complaints are substantively identical. Both assert claims against CVS based on CVS's alleged role in distributing and dispensing opioids, and both provide allegations illustrating the harm and costs incurred in each county in responding to the crisis.[179] Both also assert similar statutory and common law nuisance and negligence claims.[180] While the *Rite Aid* court focused on the *Cuyahoga* complaint, that complaint provided more particularized allegations than *Summit*. And so, the *Rite Aid* holding that applied to *Cuyahoga* applies just as well to *Summit*—if not with greater force. For example, while *Summit* includes allegations of the specific number of deaths, overdoses and overall costs incurred by county departments, *Cuyahoga* goes further and provides the specific costs of treatments and the number of individuals treated for opioid-related use.[181]

Second, the policy language the Supreme Court interpreted in *Rite Aid* is substantively identical to the policy language at-issue here. In *Rite Aid*, the insurers contracted to pay damages "because of 'personal injury'" or "property damage."[182]

---

[179] *See generally* Summit Compl., and Cuyahoga Compl.

[180] *See* Summit Compl. ¶¶ 975-1072, 1091-1138*;* Cuyahoga Compl. ¶¶ 1017-1115, 1134-1179.

[181] *Supra* notes 24-27; *cf.*, 33-41.

[182] *Rite Aid*, 270 A.3d at 243.

Too, covered damages "because of 'personal injury' include[d] damages by any person or organization for care, loss of services or death resulting at any time from the 'personal injury.'"[183] And "personal injury" was defined as "bodily injury" meaning "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[184]

Here, the Chubb and AIG Policies (and Joining Insurers' Policies) contain nigh-on identical language. They cover damages "because of 'bodily injury' or 'property damage,'" and in some cases, "'bodily injury', 'property damage', or 'personal or advertising injury.'"[185] "Bodily Injury" is consistently defined across the Policies as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and may "include mental anguish or mental injury resulting from bodily injury."[186] Given that "personal injury" is defined as "bodily injury" under the policies in *Rite Aid*, the Policies here are in all substantive respects identical with those in *Rite Aid*. For these reasons, *Rite Aid* extends to the Track One Lawsuits asserted against CVS.

Under *Rite Aid*, damages for bodily injury are covered losses only when

---

[183] *Id.*

[184] *Id.*

[185] *See, e.g.*, Insurers' Motion, Exs. 21, 22; Insurers' Reply, Ex. 107. "Personal or advertising injury" is not a term at issue.

[186] *E.g.*, Insurers' Motion, Ex. 21 § VII.C.

asserted by (a) the person injured, (b) a person recovering on behalf of the person injured, or (c) people or organizations that treated the person injured or deceased, who demonstrate the existence of and a cause of the injuries.[187] The claims in the *Cuyahoga* and *Summit* complaints are brought by governmental entities seeking recovery of economic losses in responding to the opioid crisis. They are not claims brought by the person injured, because the governmental entities do not claim they themselves have suffered bodily injury. They also are not bringing claims on behalf of an individual person injured. Indeed, they disclaim personal injury claims and do not base the claims on the injuries of others.[188] Finally, the claims are not seeking to recover for the care incurred in treating a person injured or deceased because they seek general economic losses in responding to the opioid crisis. Though the Plaintiffs in *Rite Aid* highlighted county-specific statistics in the *Cuyahoga* complaint to try to demonstrate that the claims were seeking recovery for the costs incurred in the treatment of the individual citizens, a close examination of the allegations in the Track One Suits reveals that the most particularized allegations are intended only to illustrate the economic losses suffered by the counties. They are not, in fact, the "basis of the claims."[189]

---

[187] *Rite Aid*, 270 A.3d at 247.

[188] Summit Compl. ¶ 1038, Cuyahoga Compl. ¶ 1080.

[189] *See generally* Summit Compl. and Cuyahoga Compl.; *id*. at 250-51; *Rite Aid*, 270 A.3d at 250-51.

**2. Insurers Have No Duty to Defend CVS for the Additional Representative Suits Because the Plaintiffs Do Not Seek Damages "Because of Bodily Injury."**

A review of the Additional Representative Suits shows there are no substantial differences from the Track One Suits. Each Additional Representative Suit alleges similar misconduct by CVS in its failure to properly distribute and/or dispense opioids. Thus, *Rite Aid* extends to the Additional Representative Suits.

Like the Track One Suits, the claims in the Additional Representative Suits do not fall under any of *Rite* Aid's three categories of coverage. They are claims brought by governmental entities seeking a combination of common law or statutory negligence or nuisance claims. They do not seek to recover for personal injury those entities themselves have suffered. And, they either specifically disclaim that they seek to recover on behalf of others.[190] Or, if they do not, the nature of the allegations and the specific damages they seek again impart that they are seeking to recover generalized economic losses in responding to the opioid crisis.[191]

What's more, though each Additional Representative Suit makes allegations

---

[190] *See* Summit Compl. ¶ 1032-33, Cuyahoga Compl. ¶ 1074-75; Cherokee Compl. ¶ 13; Philadelphia Compl. ¶ 24.

[191] CVS attempts to contort certain complaints as asserting derivative claims under (b). For instance, CVS argues that the *Florida* and *Summit* complaints are derivative actions brought on behalf of individuals suffering bodily injury relaying the basis of a single allegation that certain of the claims were brought "on behalf of" the residents. CVS Opp'n at 11, 18-19. But CVS provides no additional explanation and fails to demonstrate that those exemplative claims actually rely on proof of any individual's bodily injury.

specific to each governmental entity, even the most detailed of those allegations move the needle no further in showing that the claims fall under any one of the three categories defined in *Rite Aid*.[192] For example, CVS highlights allegations in the *Philadelphia* complaint that specify the number of people the city treated with opioid disorders year-over-year; the number of doses of naloxone administered and the approximate cost per dose; and the cost per person per month for certain drugs Philadelphia provided.[193] But our Supreme Court in *Rite Aid* rejected the notion that such allegations of aggregate costs in the *Cuyahoga* complaint transformed the prayers pled into personal injury claims.[194] Just so here. The basis of each underlying claim in the *Philadelphia* complaint, as well as the other Additional Representative Suits, is not "connected to [ ] personal injury, independently proven, and shown to be caused by the insured."[195]

In sum, none of the Additional Representative Suits comprise the personal injury claims *Rite Aid* would recognize as triggering coverage under the requirement that such claims must truly be seeking damages because of bodily injury to an

---

[192] The *Philadelphia* Complaint alleges the most particularized facts when compared to the other Additional Representative Suits, whereas the New York suits provides the barest county-specific allegations. *See, e.g.*, Philadelphia Compl. ¶¶ 292-300, 554-557, 561, 572, 582, 584, 590, 595-96, 601; *cf.*, Suffolk and Nassau Compls.

[193] CVS Opp'n to Insurers' Motion at 9; *see also* Philadelphia Compl. ¶¶ 590, 595-96, 606.

[194] *See Rite Aid*, 270 A.3d at 246.

[195] *See id.* at 251.

individual.

**3. Inclusion of Pharmacist Liability Endorsement and Druggist Endorsement Is of No Moment; The Threshold Requirement That Damages Must Be Because of Bodily Injury or Property Damage Adheres Thereto.**

CVS contends the Pharmacist Liability Endorsement in the Chubb Policies and the Druggist Endorsement in the AIG Policies broaden coverage. The Pharmacist Liability Endorsement states in relevant part that Chubb agrees to pay on behalf of CVS "all sums in excess of the Schedule of Insured's Retained Limits that [CVS] shall become legally obligated to pay as damages because of 'bodily injury' arising out of a 'pharmacist liability incident.'"[196] A "pharmacist liability incident" is an "actual or alleged negligent act, error or omissions, . . . in the performance of a 'pharmacist professional service.[197]'" A "pharmacist professional service" includes the "preparation, selling, handling or distribution of drugs."[198]

CVS says the "arising out of" language should be construed broadly under Delaware law.[199] Additionally, give CVS argues it made allegations related to the preparation, selling, handling or distribution of prescription drugs, it believes the Chubb Policies are triggered.[200]

---

[196] Insurers' Motion, Ex. 21 at End. 27; CVS Opp'n to Insurers' Motion, Ex. 22 at End. 24.

[197] *Id.*

[198] *Id.*

[199] CVS Opp'n to Insurers' Motion at 2, 13-14.

[200] *Id.* at 14.

Yet the problem with CVS's construction is that the claims must first satisfy the threshold requirement that they seek "damages because of bodily injury." If the claims *ab initio* seek damages because of bodily injury, then the next question is whether the damages arose from "an occurrence." The Pharmacist Liability Endorsement modifies the "occurrence" requirement. It does not expand the scope of—nor in any other way alters—the separate threshold requirement that claims must seek damages because of bodily injury. Because the Track One Suits and Additional Representative Suits don't assert claims seeking damages because of bodily injury, the inclusion of the Pharmacist Liability Endorsement changes nothing.

The same with respect to the Druggist Endorsement. That Endorsement allows "'[b]odily injury' or 'property damage' arising out of the rendering of or failure to render professional health care services as a pharmacist shall be deemed to be caused by an 'occurrence.'"[201] Again, the "occurrence" must be causation of specific identified individualized bodily injury or property damage, not generalized governmental economic loss. In this regard, the Druggist Endorsement is and acts no differently than the Pharmacist Liability Endorsement.

---

[201] Insurers' Reply, Ex. 107 at Druggist End.

### 4. CVS Fails to Demonstrate That the Policies' Language Warrants a Departure from *Rite Aid*.

In a last-breath attempt to draw distinctions in the policy language, CVS makes poorly developed arguments that the differences in language such as "sustain," "claim" and the inclusion or omission of words such as "any," "a" and "the" have transformative significance here.[202] The Policies define bodily injury to include "bodily injury, sickness or disease sustained by a person" and "damages claimed by any person or organization for care, loss of services, or death resulting at any time from the 'bodily injury.'"[203] CVS argues that "damages '*claimed*'" by any person or organization cannot mean the same thing as "damages '*sustained*'" by a person.[204] But CVS does little to explain why this difference is significant. It says blithely that the phrasing just cannot mean the same thing.

It is unclear what exactly CVS is arguing, but in an effort to address CVS's objections, one point: to the extent CVS is arguing that the difference in the policy language shows that the policies were intended to extend to the Opioid Lawsuits where governmental entities "claim" damages for bodily injury that they did not themselves "sustain," CVS is essentially describing derivative claims. Those claims, however, must directly relate to and be predicated upon a particular bodily injury.

---

[202] CVS Opp'n to Insurers' Motion at 19-20.

[203] *See, e.g.*, Insurers' Motion, Ex. 21 § VII.C; CVS Opp'n to Insurers' Motion, Ex. 22 § VII.C.

[204] CVS Opp'n to Insurers' Motion at 19.

None of the complaints seek to recover for damages because of the individual injuries sustained by a person.  Indeed, the complaints expressly belie such as their grounds—they seek redress for the communal economic losses suffered.

CVS also argues the omission of "the" preceding "bodily injury" is significant because it suggests no "direct link" between the bodily injury and the person is required.[205]  CVS then claims the Policies' grants have no such link.[206]  But that's not true.  Damages for bodily injury include "damages claimed by any person or organization for care, loss of services, or death resulting at any time from *the* 'bodily injury.'"[207]  In addition, CVS says the omission of "the" in damages that "include mental anguish or mental injury resulting from bodily injury" also suggests that no direct link is needed.[208]  But CVS is not contending the complaints seek recovery of damages for mental anguish or mental injury.

## C. THE POLICIES AND "PROPERTY DAMAGE"

The property damage allegations in the Track One Suits and Additional Representative Suits do not independently trigger coverage under the Policies.[209]  The rationale in *Rite Aid* concerning the requirement to assert claims that seek

---

[205] *Id*. at 20.

[206] *Id*.

[207] *See* Insurers' Motion, Ex. 21 § I.D; CVS Opp'n to Insurers' Motion, Ex. 22 § I.D.

[208] CVS Opp'n to Insurers' Motion at 20.

[209] *Id*. at 16-17.

-43-

recovery of damages because of bodily injury is the same when it comes to property damage. In *Rite Aid* the Supreme Court held that "[t]here must be more than some linkage between the personal injury and damages to recover 'because of' personal injury."[210] Here, "bodily injury" and "property damage" appear side-by-side in the Policies, and there is no reason why claims based on property damage require less of a causal relationship than that required for claims because of bodily injury.[211] Just as the individual physical injury must be "the basis of the claims," so must the property damage be the basis of claims for loss because of "property damage."[212]

The Court is not alone here. In *West National Insurance v. Quest Pharmaceuticals*,[213] the Sixth Circuit analyzed its earlier decision in *Lenning v. Commercial Union Insurance*[214] that "purely economic damages" are "too attenuated from a specific covered injury" to trigger coverage "'because of' . . . property damage."[215] Under the opioid-related claims pled in *Quest*, the governmental entities did not need to prove the underlying injury to the property in order to recover for the costs associated in repairing the damaged property.[216]

---

[210] *Rite Aid*, 270 A.3d at 250.

[211] *See, e.g.*, Insurers' Motion, Ex. 21 § I.A.

[212] *Rite Aid*, 270 A.3d at 250-51.

[213] 57 F.4th 558 (6th Cir. 2023).

[214] 260 F.3d 574 (6th Cir. 2001).

[215] 57 F.4th at 566; 260 F.3d at 582-83.

[216] 57 F.4th at 567.

Accordingly, the court determined the plaintiffs were seeking "purely economic damages that related to but did not directly implicate the covered injury of property damage."[217]

Same here. The Opioid Lawsuits seek nothing more than economic damages that relate to but do not directly implicate the covered injury of property damage. Consequently, there is no duty to provide coverage.

## D. JOINING INSURERS DO NOT OWE A DUTY TO INDEMNIFY

To be sure, the duty to defend "may be broader than the duty to ultimately indemnify."[218] The Insurers argue that if there is no duty to defend CVS for the Track One and Additional Representative Lawsuits, there is necessarily no corresponding duty to indemnify.[219] CVS responds that only the Joining Insurers' moved for partial summary judgment on the duty to indemnify, and that moving for summary judgment is premature.[220]

As has been shown, the nature of the claims and the relief plaintiffs seek in the Track One and Additional Representative Suits do not depend on proof of

---

[217] *Id.*

[218] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 72-73 (citing *Am. Ins. Grp. V. Risk Enter. Mgmt., Ltd.* 761 A.2d 826, 830 (Del. 2000)).

[219] Insurers' Supplemental Memorandum in Further Support of Chubb and AIG's Motion for Partial Summary Judgment and the Joining Insurers' Motion for Partial Summary Judgement ("Insurers' Supp. Motion") at 5-6.

[220] CVS Supp. Opp'n at 5-6.

personal injury. It is therefore unclear how development of the facts as it relates to any alleged individual's personal injury in the underlying nine Opioid Lawsuits would happened or could trigger the Insurers' duty to indemnify. Indeed, the cases relied upon by CVS demonstrate this point.

For example, CVS cites to *Premcor Refining Group, Inc. v. Matrix Service Industrial Contractors, Inc.,* for the proposition that "indemnification is ultimately determined upon the facts as revealed during discovery or are ultimately presented at trial."[221] In *Premcor*, plaintiff operated a refinery where two workers died from an accident.[222] The workers were hired out to an independent contractor which had entered into a service agreement with the refinery's operator.[223] The insurance contract provided that the independent contractor must obtain insurance for the benefit of itself and that operator.[224] To that end, the independent contractor entered into an insurance agreement with the defendant insurance company with respect to any liability arising out of the contractor's operations or work.[225] After an accident caused the death of two workers, plaintiffs in the underlying complaints brought wrongful death claims against the refinery operators of the refinery, but none against

---

[221] CVS Supp. Opp'n at 5-6 (citing 2009 WL 960567, at *12 (Del. Super. Ct. Mar. 19, 2009)).

[222] *Id.* at *1.

[223] *Id.*

[224] *Id.*

[225] *Id.*

the contractor.[226]  The operator of the refinery then brought claims against the insurance company seeking duty-to-defend coverage and indemnification.[227]  In response, the insurance company denied that the deaths were caused by the independent contractor's work—*i.e.*, the basis for the duty to defend and indemnify the operator of the refinery.[228]  The court granted the insurance company's motion for summary judgment on the duty to defend, but denied it on the duty to indemnify.[229]

On the duty to defend, the court found no allegations in the underlying complaints tying the contractor's work to potential liability, and without that allegation, the insurance company had no duty to defend the lawsuits raised against the refinery operator.[230]  But with respect to the duty to indemnify, it denied summary judgment because later discovery could show the extent of the *contractor's* involvement.[231]

There, reserving a ruling for indemnification later in the proceedings made sense because the estates of the deceased workers were bringing individual derivative claims and sought damages directly based on the personal injuries and

---

[226]  *Id.* at *4.

[227]  *Id.* at *2.

[228]  *Id.*

[229]  *Id.* at *13.

[230]  *Id.* at *11.

[231]  *Id.* at *12.

deaths of the workers. But here, the development of allegations illustrating the extent of the opioid crisis will not change the fact that the plaintiffs in the underlying complaints have asserted claims for general, economic losses to respond to the opioid epidemic, not personal injury claims. In other words, nothing can come about that will transmute or transform the various governmental claims into those for bodily injury or property damage covered by the Policies. Accordingly, because there is no duty to defend the Track One and Additional Representative lawsuits, there is also no corresponding duty to indemnify.

## VI. CONCLUSION

For the reasons stated above, the Insurers' Motion for Partial Summary Judgment is **GRANTED**, and Joining Insurers' Motion for Partial Summary Judgment is also **GRANTED**.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**

-48-